[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 2, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15663
Non-Argument Calendar

_____

D. C. Docket No. 06-00134-CR-2-LSC-JEO

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OLIMPIO MONZON-GOMEZ,
WALFRIDO CABALLERO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(August 2, 2007)**

Before TJOFLAT, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Walfrido Caballero and Olimpio Monzon-Gomez were indicted on one count each of possessing with the intent to distribute "100 kilograms or more of a mixture or substance containing a detectable amount of marijuana," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii). They were convicted by a jury. Caballero was sentenced to serve 63 months in prison. Monzon-Gomez, whose base offense level under the Sentencing Guidelines was increased by two levels for obstructing justice (testifying falsely) at trial, was sentenced to serve 78 months in prison, the low end of the applicable Guidelines range of 78 to 97 months.

Before trial, Caballero and Monzon-Gomez moved to suppress the marijuana they were charged with possessing. They challenged as an unlawful seizure the traffic stop that gave rise to their arrest, arguing, first, that it was not supported by any individualized suspicion of wrongdoing and, second, that, even if the stop was lawful at its inception, their detention nevertheless became unlawful when the stop was extended for an unreasonable length of time without justification. The district court rejected both arguments and denied their motions to suppress. They appeal that denial, renewing the same arguments they made below. Additionally, Monzon-Gomez appeals his 78-month sentence, arguing that

2

the district court, over his objection, incorrectly applied the two-level sentencing enhancement for obstruction of justice.[1]

After a careful review of the briefs and the record, we conclude, first, that the seized marijuana was not subject to exclusion under the Fourth Amendment and, second, that the district court properly applied the two-level sentencing enhancement. Accordingly, we affirm the denial of Caballero and Monzon-Gomez's motions to suppress and affirm Monzon-Gomez's 78-month sentence.

## I

In reviewing the disposition of a motion to suppress, we "review[] the district court's findings of fact under the clearly erroneous standard and the district court's application of law to those facts de novo." United States v. Simms, 385 F.3d 1347, 1356 (11th Cir. 2004) (internal quotation marks omitted). And we "construe the facts in the light most favorable to the party who prevailed below" — here, the Government. United States v. Muegge, 225 F.3d 1267, 1269 (11th Cir. 2000) (citation omitted).

"We review for clear error the district court's factual findings necessary for an obstruction of justice enhancement based on perjury," United States v. Gregg,

---

[1] Apart from this argument, Monzon-Gomez does not in any way challenge the reasonableness of his sentence.

3

179 F.3d 1312, 1316 (11th Cir. 1999), and, in reviewing the perjury enhancement, "[w]e accord great deference to the district court's credibility determinations." Id.

## II

On February 18, 2006, Jude Washington, a deputy sheriff employed by the Jefferson County Sheriff's Department, was on patrol when he observed a car leaving "one of the known drug houses" in Jefferson County. He began to pursue the car when its driver "took off on me." Washington followed the car into an old mining community known as Mulga Mines, which is located outside of Birmingham about nine miles from Interstate 20 (I-20). Testimony at the suppression hearing established that the "tight windy roads" through Mulga Mines are dangerous and cannot be safely negotiated by speeding drivers. Mulga Mines is accessible by only one road, making it somewhat isolated.

Having lost sight of the car he was pursuing, Washington tried to locate it by driving down a dirt road, but decided not to do so for fear of getting stuck in the mud. The road was muddy because it had been raining on and off all day long. As he continued his pursuit, sometime between 10:00 a.m. and 11:15 a.m., Washington "saw a big-rig truck backed into another muddy dirt road, which was probably 150 feet back from" the paved road. According to Washington, the tractor-trailer "was real deep in there" and was obscured by heavy foliage. The

4

road where Washington observed the truck, described at the suppression hearing as a driveway, was largely "unkempt" because the single house to which it led had been abandoned for at least six years.  Washington did not "see any activity . . . around the truck" and found it "bizarre that someone would back a truck up in that mud and leave it there."

Verbon Latta, another deputy sheriff in the Jefferson County Sheriff's Department, was also on patrol on February 18th.  Latta had been patrolling Mulga Mines on a daily basis since 2000, so he knew the area "very well." According to Latta, Mulga Mines is "known as a drug area," a place where drugs are "routinely sold" and where law enforcement officers "routinely recover stolen items, stolen vehicles."  With regard to the driveway where Washington spotted the tractor-trailer, Latta said that there had been "dozens" of drug arrests in that vicinity for "crack cocaine, marijuana, and pills."  According to Latta, stolen vehicles are routinely taken to the end of the driveway, stripped for parts, and abandoned.  In the six years since Latta had begun patrolling Mulga Mines, authorities had recovered "over 50" stolen vehicles from that location.

Around 12:00 p.m., Latta was dispatched to the driveway in response to a telephone call from a concerned citizen, who had called the sheriff's office to report a "suspicious" "18-wheeler in a driveway."  The caller had asked that

someone come "check it out." After he received the dispatch, Latta heard deputy Washington say over the radio that, based on his earlier observation, the truck had been parked in the driveway for more than an hour. And Latta heard fellow deputy sheriff Burton say that the truck had not been there "in the last several days."

As Latta was nearing the driveway, he observed a tractor-trailer traveling toward his patrol car on the paved road "at a pretty good clip." He estimated its speed at 35 to 40 miles per hour. The speed limit was 25 miles per hour. Latta was concerned about the tractor-trailer's speed because of the sharp, curvy roads in Mulga Mines. As the tractor-trailer passed by him, Latta observed two men in the cab and noticed that all the tires were covered in mud. Latta turned around and briefly followed the tractor-trailer as he radioed in its description and tag number. Latta then turned on his flashing lights and pulled the truck over at the intersection of Slope Drive and Mulga Loop Road. Latta testified at the suppression hearing that he pulled the tractor-trailer over for speeding. The driver, Monzon-Gomez, exited the cab and immediately approached Latta, seeming to indicate that he was lost. According to Latta, Monzon-Gomez, in broken English, said, "Interstate 20, make a left, make a right, make a left."

Latta warned Monzon-Gomez that "he was over the speed limit," but did not

issue him a citation. In an effort to help him find his destination, Latta asked Monzon-Gomez where he was going. Monzon-Gomez responded, "Dole," which Latta took to mean the corporate produce supplier. Latta asked for Monzon-Gomez's paperwork to see if it listed an address. Monzon-Gomez handed over some papers, but Latta could not find anything about Dole and did not see any address for a scheduled delivery in Alabama. During this exchange, Latta found it curious that Monzon-Gomez could have become so lost, so far away from I-20, in an isolated community that happened to have a reputation as a "known drug area."

Deputy Washington joined Latta at the scene less than five minutes after the tractor-trailer was pulled over, while Latta was still examining Monzon-Gomez's travel papers. When Washington arrived, Latta told him that he had noticed something odd about the back door of the trailer. The trailer was a refrigerated trailer, and Latta knew from firsthand experience that properly equipped refrigerated trailers are supposed to have a seal on the right-hand back door as a safety feature to ensure that the food inside "has not been tampered with in any way" during transport. Such seals, according to Latta, are supposed to be checked at every delivery point. The trailer Monzon-Gomez was hauling had no such seal; instead, the door to the trailer was outfitted with a combination lock. Latta found the presence of a combination lock on a refrigerated trailer suspicious.

7

The deputies asked Monzon-Gomez where he and his friend were coming from, and Monzon-Gomez responded that they were returning to Miami from Texas. Monzon-Gomez told Washington that they had been parked in the driveway for only "a few minutes" and that they had gone there only to turn the trailer around. Washington found these statements suspicious for two reasons: first, because he had seen the very same tractor-trailer parked in the driveway earlier that morning and, second, because, before arriving at the driveway, one would have first driven past a large church parking lot much more suitable for turning around a tractor-trailer. Monzon-Gomez told Washington that they had exited I-20 to get something to eat. To Washington, that explanation did not account for why they were in Mulga Mines because the closest place to get something to eat was at the exit "where he got off" I-20, which was nearly nine miles away.

Washington next spoke to Caballero, who said that he and Monzon-Gomez were returning from California, not Texas. Caballero confirmed the story given by Monzon-Gomez that they became lost while looking for somewhere to eat and had driven down the driveway merely to turn the trailer around. When asked what he was carrying in the trailer, Monzon-Gomez immediately walked to the back of the trailer and opened the doors, revealing "boxes of lettuce stacked from the floor to

8

the ceiling." Washington noticed "a bunch of little blackberries and leaves" in the back of the trailer, berries and leaves of the same variety he had observed growing along the side of the driveway where the tractor-trailer had been parked. Washington and Latta also observed muddy footprints leading into the back of the trailer and noticed that the boxes at the top of the pile were dented and crumpled. At first, Monzon-Gomez told Washington that he had not been in the back of the trailer at all. But when Washington showed him the muddy footprints, Monzon-Gomez corrected himself, saying that he had entered the trailer because his load of lettuce had shifted and he needed to "straighten it up." Deputy Burton, who had since arrived on the scene, noticed muddy footprints on top of the stack of boxes. All these observations led Washington and Latta to disbelieve Caballero and Monzon-Gomez's story about why they were in the Mulga Mines community.

Based on Caballero's and Monzon-Gomez's inconsistent statements and their presence in a known drug area, Washington called his sergeant and requested that a K-9 Unit be brought to the scene. Sergeant Lewis arrived moments later. Before calling in the K-9 Unit to sweep the tractor-trailer, Lewis decided that he and Washington should return to the driveway to have a look around. Deputies Burton and Latta remained behind with Caballero and Monzon-Gomez.

Back at the driveway, Washington immediately spotted a number of lettuce

9

boxes in an adjacent ditch. He also saw some abandoned wooden pallets and some white twine similar to the twine he had seen holding boxes together in the back of the trailer minutes before. The lettuce boxes, which were dry although it had been raining steadily all day, were open at the top and contained yellow, plastic-wrapped bricks of marijuana, which Washington was able to identify based on his law enforcement experience. Washington radioed deputy Burton and told him to arrest Caballero and Monzon-Gomez.

A short time later, Philip Hill, who handles drug-detection dogs for the Jefferson County Sheriff's Department, arrived at the driveway. Hill's German Shepherd, Teddy, quickly confirmed the presence of narcotics in the discarded lettuce boxes. Hill then took Teddy to the tractor-trailer, where Teddy immediately alerted on the cab. Marijuana was found in two separate locations inside the cab. In all, 966 pounds of marijuana were found in the ditch beside the driveway, and 72 pounds were found in the cab of the truck. The entire episode — from the time Latta pulled the tractor-trailer over until the time that the marijuana was found and the arrests were made — lasted only 30 minutes.

**III**

**A**

Caballero and Monzon-Gomez first argue that the traffic stop was unlawful

at its inception because it was not supported by any individualized suspicion of wrongdoing. We disagree. "Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred, . . . and an officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (internal citations and quotation marks omitted). The traffic stop initiated by Latta was reasonable because Latta had probable cause to believe that the tractor-trailer was speeding.

It goes without saying that speeding is a traffic violation that may properly justify a traffic stop. Indeed, Monzon-Gomez and Caballero do not dispute this point, see Monzon-Gomez's Br. at 7 ("police officers can constitutionally pull over a vehicle when they have probable cause to believe the car is speeding"),[2] nor do they argue that Monzon-Gomez was not speeding. Instead, their only argument is that "Deputy Latta lacked probable cause to stop the Appellant for speeding in that the device used to measure the speed of vehicles is not observation, but some type of radar device." Id. at 7-8 (emphasis added). We disagree. The Fourth Amendment plainly does not prohibit a law enforcement

_____

[2] Caballero has adopted on appeal all the arguments made in Monzon-Gomez's brief.

11

officer from pulling over a motorist for suspected speeding whenever the officer is acting solely on the basis of his visual observation. Stated differently, the Fourth Amendment does not require the use of radar detection to establish probable cause to believe a motorist is speeding.[3] Caballero and Monzon-Gomez have cited no legal authority to support their contrary position and we have found none.

The district court expressly found in its order denying Caballero and Monzon-Gomez's motions to suppress that "[n]othing in the record disputes the fact that Latta observed the defendants' speeding vehicle." This factual finding has not been shown to be clear error, and we accordingly conclude that the traffic stop of the tractor-trailer was lawful under the Fourth Amendment because it was supported by probable cause to believe a traffic law had been violated.[4]

**B**

Caballero and Monzon-Gomez next argue that, even if lawful at its

---

[3] Monzon-Gomez's assertion that "some type of radar device" is necessary to justify a traffic stop for speeding is misplaced. It may well be true that visual observation alone, unaccompanied by evidence of speeding generated by a properly tested "speed measuring device," Ala. Code § 32-5A-177, would be insufficient as an evidentiary matter to successfully prosecute a speeding violation in court under Alabama law. Id. But evidentiary burdens are not implicated where Fourth Amendment probable cause is concerned. With regard to traffic stops under the Fourth Amendment, the question is simply whether a law enforcement officer has sufficient cause to believe that a traffic law has been violated, not whether such a violation can be successfully prosecuted in court.

[4] The fact that Latta did not issue a speeding citation, a point emphasized by both Caballero and Monzon-Gomez, is irrelevant to the probable-cause inquiry.

12

inception, the traffic stop became unlawful when Washington and Latta, without reasonable suspicion of criminal activity, prolonged its duration beyond the time "necessary to effectuate the purpose of the stop." Monzon-Gomez's Br. at 9. We conclude, however, that the traffic stop was lawful at all times because the deputies on the scene had sufficient reason to believe that Caballero and Monzon-Gomez had engaged in criminal activity, and the 30 minutes it took to confirm the deputies' suspicion was not unreasonably long.

"[T]he <u>duration</u> of [a] traffic stop must be limited to the time necessary to effectuate the purpose of the stop."[5] <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001) (alterations added; emphasis in original). Generally, the durational limit on a traffic stop means that the stop "may not last any longer than necessary to process the traffic violation." <u>Id.</u> (internal quotation marks omitted). But "an officer may prolong a traffic stop" for a reasonable amount of time beyond that which is necessary to process the traffic violation "if he has articulable suspicion of other illegal activity." <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003). And in those circumstances, the lengthened detention may last as long as is reasonably necessary for the officer to "pursue[] a means of

_____

[5] Caballero and Monzon-Gomez challenge only the "duration" of their detention and not its "scope." <u>See Purcell</u>, 236 F.3d at 1277 (differentiating between challenges to the duration of a traffic stop and challenges to the scope of such a stop).

13

investigation likely to" confirm or dispel his suspicions about the criminal activity. United States v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006).

Caballero and Monzon-Gomez argue that they "should have been permitted to leave" the scene as soon as Latta made the decision not to "issue a citation" for speeding (the reason for the stop) and after Latta did not find "anything amiss with Monzon's driver's licence [or] paper work." Caballero's Br. at 6. Instead, the deputies "asked further questions," which Caballero and Monzon-Gomez say impermissibly lengthened their detention, thus making the stop unreasonable under the Fourth Amendment. We disagree. Because deputies Latta, Washington, and Burton had reasonable suspicion sufficient to justify a brief investigation aimed at determining whether Caballero and Monzon-Gomez had engaged in illegal activity, and because that investigation was not unreasonably long, we conclude that their continued detention was lawful.

As an initial matter, we note that Caballero and Monzon-Gomez were stopped in a "known . . . drug area." Standing alone, this fact is of course not sufficient to create the reasonable suspicion necessary to justify their continued detention. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant

14

further investigation." Id. That is why "the fact that the stop occurred in a 'high crime area'" is "among the relevant contextual considerations" in determining the legality of an investigatory detention. Id. The fact of their presence in a known drug area does not stand alone in this case. Other "contextual considerations" made the deputies suspicious that criminal activity was afoot.

When independently asked where they were coming from, Caballero said California, and Monzon-Gomez said Texas. Monzon-Gomez told Latta that he was looking for the Dole produce company, but the papers he handed Latta did not show any address for that company and did not list any delivery destination in the State of Alabama. Caballero and Monzon-Gomez told the deputies that they had exited I-20 looking for a place to eat and had, in the process, become lost in Mulga Mines. This part of the story did not add up to the deputies, however, because there was a restaurant at the very I-20 exit where Caballero and Monzon-Gomez left the interstate, yet for reasons never explained they wound up driving approximately nine miles to an isolated community whose narrow, curvy roads were especially inhospitable to tractor-trailers.

Monzon-Gomez told Washington that they had stopped in the driveway for only "a few minutes" while turning the trailer around. Washington knew, however, that the tractor-trailer had been parked "probably 150 feet" down the

15

driveway for nearly an hour, because he had seen it there between 10:00 a.m. and 11:15 a.m. and Latta had seen it leaving the driveway shortly after 12:00 p.m. Washington also found suspicious Caballero's statement that they were using the driveway to turn the trailer around, because, to get to the driveway, they would have had to drive right past a large church parking lot much more suitable to the task.

Latta found it suspicious that there was a combination lock on the door of a refrigerated trailer — the type of trailer which, as Latta knew from firsthand experience, should have had a seal on the right-hand door to ensure that the produce inside the trailer had not been tampered with. When the deputies asked him what he was hauling, Monzon-Gomez voluntarily opened the back door of the trailer, revealing muddy footprints, a pile of damaged lettuce boxes, and "a bunch of little blackberries and leaves" like the ones Washington had seen growing beside the muddy driveway. Given the presence of muddy footprints and the presence of leaves matching those found by the driveway, it was odd when Monzon-Gomez said that no one had been in the back of the trailer. When Washington showed him the footprints, Monzon-Gomez quickly changed his story, saying that he had climbed in the back of the trailer to "straighten . . . up" his load.

16

In light of the fact that their numerous inconsistent statements rendered their story implausible, that their trailer was not properly equipped to be transporting refrigerated produce, and that they had spent nearly an hour (if not longer) in an abandoned driveway in a "known . . . drug area," we readily conclude that the deputies on the scene had ample reasonable suspicion of criminal activity to briefly detain Caballero and Monzon-Gomez while Washington and Lewis went to the driveway to confirm or dispel their suspicions. Thus the duration of their detention was not unlawfully prolonged under the Fourth Amendment.

## C

Under the Sentencing Guidelines, Monzon-Gomez had a criminal history category of I. His base offense level was 26. After concluding that he obstructed justice by giving perjured testimony at trial, the district court increased Monzon-Gomez's base offense level by two points, bringing his adjusted offense level to 28. See U.S.S.G. § 3C1.1. The Guidelines sentencing range applicable to Monzon-Gomez, following the obstruction-of-justice increase prescribed by § 3C1.1, was 78 to 97 months. The district court sentenced him to serve 78 months in prison.

Section 3C1.1 instructs a district court to "increase [a defendant's] offense level by 2 levels" if "the defendant willfully obstructed or impeded . . . the

17

administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction" and if "the obstructive conduct related to [] the defendant's offense of conviction." A defendant obstructs or impedes the administration of justice within the meaning of this provision if he "commit[s] . . . perjury" at his trial. U.S.S.G. § 3C1.1, cmt. n. 4(b).

For purposes of § 3C1.1, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993). Matters considered "material" include "statement[s], or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n. 6.

If a defendant objects to the proposed application of § 3C1.1, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." Dunnigan, 507 U.S. at 95, 113 S. Ct. at 1117. Observing its obligation under Dunnigan, the district court in this case "review[ed] the evidence" and "ma[d]e independent findings" with respect to two separate statements[6] made by

---

[6] At the sentencing hearing, the district court identified the statements as follows:

The first [statement] is that he [Monzon-Gomez] was traveling through

18

Monzon-Gomez at trial, concluding that "those two statements are material, were made under oath, and were necessarily false based upon the jury's verdict."

Monzon-Gomez does not dispute that the statements identified by the district court were made under oath at trial, that they were material, or that they constituted perjury within the definition set forth in Dunnigan.[7]  Instead, he argues only that "[t]he district court failed to articulate a separate and independent ground to support an enhancement" because the court imposed the enhancement based "on the fact that the jury's verdict was irreconcilable with the Appellant's testimony." Monzon-Gomez's Br. at 14.  We disagree.  In remarking on the incompatibility of Monzon-Gomez's trial testimony and the jury's verdict, the district court was making a simple credibility determination — that Monzon-Gomez testified untruthfully — that we are bound to respect.  See Gregg, 179 F.3d at 1316.  This adverse credibility determination was sufficient "to establish . . . [an] obstruction of justice."  Dunnigan, 507 U.S. at 95, 113 S. Ct. at 1117.  The district court's determination that Monzon-Gomez intentionally perjured himself at trial is amply

_____

Birmingham, not because of a drug drop, but because it was a more efficient route known based on construction and other road conditions and highway conditions. And the second was his claim under oath that he had nothing to do with the drugs that were dropped.

[7] Monzon-Gomez does not argue that his testimony at trial was the result of "confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94, 113 S. Ct. at 1116.

supported by the record, and we therefore affirm its application of the § 3C1.1 enhancement.

## IV

For the reasons stated above, we affirm the denial of Cabarello and Monzon-Gomez's motions to suppress and affirm Monzon-Gomez's 78-month sentence.

**AFFIRMED.**