**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

July 14, 2014

# In the Court of Appeals of Georgia

A14A0683. BODIFORD v. THE STATE.

BRANCH, Judge.

Ricardo Breshard Bodiford appeals from an order of the Henry County Superior Court denying his motion to suppress cocaine discovered in his car during a traffic stop. Bodiford asserts that the trial court erred in denying his motion to suppress because police discovered the cocaine only after the arresting officer impermissibly prolonged the traffic stop for the purpose of conducting a drug investigation, and because the officer lacked a legal basis for expanding the scope of the traffic stop beyond its original purpose. We agree with Bodiford and therefore reverse the trial court's order.

At a hearing on a motion to suppress, the trial judge sits as the trier of fact. *Gonzalez v. State*, 299 Ga. App. 777, 778 (1) (683 SE2d 878) (2009). On appeal from

the grant or denial of such a motion, therefore, this Court "must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous. However, we owe no deference to the trial court's conclusions of law and are instead free to apply anew the legal principles to the facts." *State v. Able*, 321 Ga. App. 632-633 (742 SE2d 149) (2013) (punctuation and footnote omitted).

The relevant facts in this case are undisputed and the record shows that while patrolling I-75 on the evening of October 30, 2012, Officer Jason Hart of the Henry County Police Department performed a traffic stop of a car being driven by Bodiford after Hart detected the car traveling 10 miles per hour over the posted speed limit. Hart initiated the traffic stop at 6:40 p.m., and a video recording of that stop was introduced into evidence at the hearing on the motion to suppress.[1]

Hart testified that when he asked Bodiford for his driver's license, Bodiford appeared visibly nervous; his right hand was shaking, he was breathing heavily, and sweat was beginning to bead on his forehead. The officer therefore asked Bodiford to step out of his vehicle while Hart wrote him a courtesy warning. The video of the stop shows that Hart thereafter retrieved his citation book from his patrol car and then

---

[1] Hart testified that the video accurately reflects the traffic stop.

2

spent approximately two-and-one-half minutes writing Bodiford a warning ticket, conversing with Bodiford as he did so. The video shows that Hart explained the warning to Bodiford, and Bodiford appears to sign the citation. After he completed writing and explaining the warning, however, Hart did not give the ticket to Bodiford or return Bodiford's license. Rather, at that point, approximately six-and-one-half minutes after the traffic stop had begun, Hart questioned Bodiford about the status of his driver's license and told Bodiford the officer would need to run a check of the same. According to Hart, his standard practice was to refrain from running a license check until at or near the time he had completed writing the traffic citation.

The video of the traffic stop shows Hart standing between Bodiford's car and his patrol car, using his shoulder-mounted radio to provide dispatch with Bodiford's driver's license number. After transmitting the license information to dispatch, Hart asked Bodiford whether he had any contraband in the car, such as drugs, guns, or excessive amounts of cash. When Bodiford responded negatively, Hart asked for permission to search the car. Bodiford questioned Hart as to whether he was required to consent to an automobile search and Hart explained that Bodiford had a constitutional right to refuse, but that if Bodiford refused consent, "what I'm gonna do is, I'm gonna get my dog out of the [patrol] car, run my dog around [your] car and

3

see if he shows any positive odor response on the vehicle." When Bodiford refused to give an unequivocal "yes" to Hart's request for consent to search the car, the officer patted him down, instructed him to stand away from his car and next to Hart's patrol car, and asked for and received permission to turn off Bodiford's car.

After turning off Bodiford's car, and approximately nine minutes into the traffic stop, Hart returned to his patrol car to retrieve his dog. Although Hart cannot be seen on camera at this point, dispatch can be heard very clearly on the radio attempting to contact Hart. Hart, however, did not respond to the dispatcher. At the hearing below, Hart testified that he heard dispatch attempting to reach him, but explained that he did not respond because he was "in [the] process of hooking my lead up to my dog and I didn't want to take my hands off it in order to key up on the radio." The officer acknowledged, however, that at the time he received the radio call, he had not yet removed his dog from the patrol car. After Hart failed to respond to the radio call, the dispatcher can be heard on the recording making a second attempt to reach the officer. Seven seconds later, as he was standing together with his dog next to Bodiford's car, Hart responded to the radio call, telling the dispatcher, "I'm in a bad spot here." Hart testified that his response resulted from the fact that radio service on the part of I-75 where the traffic stop was occurring was "very poor" and that "90 percent of the time"

4

officers in that area would need to use the radio in their patrol car to speak with dispatch. Hart further explained that once dispatch was told he was in a bad spot for radio, the dispatcher would know she should make no further attempts to contact him; rather, the dispatcher would wait for Hart to contact her.

Having thus instructed dispatch not to initiate any further contact with him, Hart walked his dog around Bodiford's car. The dog indicated that there was contraband in the car and Hart then searched the vehicle. During that search, the officer found a large quantity of cocaine located underneath a passenger-side seat. Based on this discovery, Hart arrested Bodiford.

Savannah Black was the Henry County dispatcher with whom Hart had contact during the incident in question. She testified that dispatch operators fulfill two general functions with respect to traffic stops. First, dispatchers create a computer-aided dispatch ("CAD") report for every traffic stop conducted. Second, the operators log all relevant information into those CAD reports as the information is received. Such information would include the make, model, and tag number of the car being stopped and the license information of the driver. According to the CAD report generated in connection with the stop of Bodiford, Black sent Bodiford's driver's license information to the GCIC at 6:46:13 p. m., and the results of that check were

transmitted back to her two seconds later, at 6:46:15 p. m.[2] At 6:48:14 p. m., Bodiford logged that information into the CAD report, and she testified that as a matter of routine practice, her next step would be to communicate the results of the license check to the requesting officer. The record shows that Black's first attempt to contact Hart occurred at 6:48:45 p.m., or approximately 30 seconds after Black logged the information received from GCIC regarding Bodiford's license into the CAD report.

Following his arrest, Bodiford was indicted on a single count of trafficking in cocaine. Prior to trial, he moved to suppress the cocaine found in his car, arguing that it resulted from an illegal detention. After holding an evidentiary hearing on that motion, the trial court denied the same but granted Bodiford a certificate of immediate review. Bodiford then filed an application for an interlocutory appeal, which this Court granted. This appeal followed.

1. On a motion to suppress contraband discovered during a traffic stop, "[t]he State bears the burden of proving that the search of the car was lawful, and to carry this burden, the State must show that it was lawful to detain [Bodiford] until the time the drug dog indicated the presence of drugs." *Dominguez v. State*, 310 Ga. App. 370,

---

[2] The license check showed that Bodiford's license was valid and that there were no outstanding warrants on Bodiford.

372 (714 SE2d 25) (2011) (citation omitted). As our Supreme Court has recently explained, claims that an officer illegally prolonged a detention resulting from a traffic stop generally fall into two categories. The first category involves those cases where the officer allegedly extended the stop "beyond the conclusion of the investigation that warranted the detention in the first place," i.e., whether the officer prolonged the stop after concluding his investigation of the traffic violation. *Rodriguez v. State*, ___ Ga. ___ (2) (b) (Case No. S13G1167, decided June 30, 2014) (citation omitted). In such cases, courts have "generally concluded" that even a "short prolongation" is "unreasonable unless . . . good cause has appeared in the meantime to justify a continuation of the detention to pursue a different investigation." Id. In the second category of cases, the detention is not extended

> beyond the conclusion of the investigation that originally warranted the detention, but it is claimed that the investigation took too long . . . . In these cases, the courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *United States v. Sharpe*, 470 U. S. 675, 686 (II) (B) (105 SCt 1568, 84 LE2d 605) (1985)."

Id. In either type of case, the touchstone of our analysis is the reasonableness of the investigating officer's conduct, i.e., we ask whether the officer's conduct in

prolonging the stop was reasonable given the objective facts known to the officer and the circumstances under which he was working. See *Walker v. State*, 314 Ga. App. 67, 73 (2) (722 SE2d 887) (2012); *Young v. State*, 310 Ga. App. 270, 273 (712 SE2d 652) (2011). See also *Rodriguez*, ___ Ga. at ___ (2) (b) ("[i]n the end, the question is whether the detention was appreciably prolonged, considering the detention as a whole, and keeping in mind that the touchstone of our inquiry is reasonableness") (citation and punctuation omitted). The question of reasonableness is one of law. See *Nash v. State*, 323 Ga. App. 438, 442 (746 SE2d 918) (2013) (in reviewing a motion to suppress resulting from a traffic stop, this Court examines whether police conduct was reasonable, based upon the facts of record); *Heard v. State*, 325 Ga. App. 135, 137 (751 SE2d 918) (2013).

Bodiford alleges that Hart unreasonably prolonged the traffic stop by extending it after he had completed the investigation of the traffic violation. In support of this argument, Bodiford points to the fact that Hart failed to initiate a check of Bodiford's driver's license at the earliest practicable time during the traffic stop, but instead waited until after he had completed all other aspects of his investigation, including the writing of the traffic citation. See *Weems v. State*, 318 Ga. App. 749, 751-752 (1) (734 SE2d 749) (2012) (holding that an officer's decision to delay initiating a license check

until after he had completed all other tasks associated with his investigation of a traffic violation, including writing the ticket, unreasonably prolonged the stop given that the record showed "no apparent reason . . . justify[ing] the officer's decision" to proceed in that fashion).[3] See also *St. Fleur v. State*, 296 Ga. App. 849, 851-852 (1) (676 SE2d 243) (2009) ("[i]t does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to *immediately investigate and determine* if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration") (punctuation and footnote omitted; emphasis supplied); *Young*, 310 Ga. App. at 273 (finding that a traffic stop was not unreasonably prolonged by an officer's decision to call a K-9 unit to the scene while awaiting the results of license checks on the driver and passenger where there was "no evidence to suggest that the officer delayed in" running those checks).

---

[3] Surprisingly, the trial court characterized *Weems*, on which Bodiford relied below, as "only a three-judge panel decision" of this Court, a sentiment echoed by the State on appeal. We note that in *Weems*, this Court reversed this same trial court judge after he denied a motion to suppress involving this same officer. These similarities not withstanding, we take this opportunity to reiterate that "[a] unanimous decision by a three-judge panel of this Court remains binding precedent until such time as it is modified or reversed by this Court en banc or our Supreme Court." *Evergreen Packaging v. Prather*, 318 Ga. App. 440, 445, n.15 (734 SE2d 209) (2012).

Alternatively, Bodiford argues that Hart extended the traffic stop by failing to pursue immediately and diligently the available means of investigation so as to complete quickly his investigation of the traffic violation that precipitated the stop. Specifically, Bodiford contends that Hart failed to pursue diligently his investigation of the traffic violation when he ignored the dispatcher's initial attempt to contact him with the results of the license check and then instructed the dispatcher not to make any further attempt to contact him. We find that regardless of whether Hart had some reason to delay initiating the check of Bodiford's license, his subsequent refusal to have any contact with dispatch, despite his knowledge that he was awaiting the results of the license check, unreasonably prolonged the traffic stop.

As noted above, the general rule is that an officer may run a check of the driver's license of both the car's driver and any passengers without unreasonably prolonging a traffic stop. *St. Fleur,* 296 Ga. App. at 852 (1). This rule, however, assumes that the time involved in running license checks will be relatively brief, and any undue delay in that process could render the length of the detention unreasonable. See *Salmeron v. State*, 280 Ga. 735, 736 (1) (632 SE2d 645) (2006) ("'a seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that

mission.' *Illinois v. Caballes,* 543 U. S. 405, 407 (125 SCt 834, 160 LEd2d 842) (2005)"). Thus, the law does not allow an officer unilaterally to extend the time reasonably required for a traffic stop by knowingly avoiding communication with dispatch after requesting a license check. See *Rodriguez*, ___ Ga. at ___ (2) (b) (whether police unreasonably prolonged a traffic stop depends upon "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly") (citation and punctuation omitted); *Salmeron*, 280 Ga. at 736 (1). In this case, Hart unilaterally extended the time for the traffic stop by failing to respond to dispatch.

The record shows that dispatch attempted to contact Hart approximately two minutes and 30 seconds after the officer requested a check of Bodiford's license. Hart, however, chose to ignore the dispatcher, despite his admitted knowledge that if the license check showed no problems, the traffic stop would be at an end and Bodiford would be free to go. According to Hart, he heard the dispatch but did not respond because he was "in [the] process of hooking my lead up to my dog and I didn't want to take my hands off it." Hart admitted, however, that he had not yet removed his dog from the car at this point. After he had retrieved his dog from his patrol car and walked towards Bodiford's car, Hart responded to the dispatcher's second attempt to

11

reach him but told her that he was in a "bad spot" for radio reception, thereby signaling the dispatcher that she should make no further effort to contact him. Hart's actions thereby ensured that the traffic stop would be prolonged at least until he had the opportunity to have his dog perform a free-air sniff around Bodiford's car.

Despite these facts, the State argues that we have no basis for reversing the trial court's order, given the court's legal conclusion that the Fourth Amendment is violated only when an officer "purposefully delay[s] the investigation [of the traffic violation] without an articulable reasonable suspicion of criminal activity" and that Hart did not act "purposefully." The trial court's legal conclusion, however, is erroneous. The law is well-established that the question of whether a traffic stop was reasonable under the Fourth Amendment does not depend upon the subjective motives, beliefs, or intentions of the individual officers involved. See *Whren v. United States,* 517 U. S. 806, 813 (II) (A) (116 SCt 1769, 135 LEd2d 89) (1996) ("[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and "the constitutional reasonableness of traffic stops [do not] depend[ ] on the actual motivations of the individual officers involved"); *Maryland v. Macon,* 472 U. S. 463, 470–471 (II) (A) (105 SCt 2778, 86 LEd2d 370) (1985) ("[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the

12

officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken") (citation and punctuation omitted); *Rodriguez*, ___ Ga. at ___, n. 13 (an officer's subjective beliefs and intentions are not dispositive factors in determining whether the officer acted reasonably under the Fourth Amendment); *Oglesby v. State*, 311 Ga. App. 615, 617 (716 SE2d 742) (2011) ("[w]hen analyzing whether a person has been unconstitutionally seized, we are not bound by the investigating officer's subjective belief") (citation and punctuation omitted); *In the Interest of A. A.,* 265 Ga. App. 369, 372 (1) (593 SE2d 891) (2004) ("the officer's subjective belief that he had authority to detain the juveniles is not controlling") (citation omitted). Rather, as noted above, our analysis requires us to determine whether the officer's conduct was reasonable "based upon the objective facts known to the officer at the time." *Oglesby*, 311 Ga. App. at 618 (citation omitted).

The State contends that Hart's conduct was reasonable because he had no way of knowing that the dispatcher was attempting to provide him with the results of Bodiford's license check. In support of this argument, the State relies on Black's testimony that a dispatcher is required to run periodic "status checks" on any officer who initiates a traffic stop by making contact with the officer at specified intervals.

13

The first such check is supposed to occur four minutes after the stop is initiated and checks should thereafter be done every five minutes until the stop is completed. If an officer makes contact with dispatch before time for the next scheduled status check, that contact restarts the clock, with the next check being due five minutes following dispatch's last contact with the officer. Black testified that she could not say whether she was attempting to contact Hart with the results of Bodiford's license check, or because she was due to make a status check on him.[4]

The fact that dispatch might have been attempting to reach Hart simply for a status check, however, does not control our analysis. Rather, the question is whether Hart's conduct in refusing contact with dispatch was reasonable, given the facts of which Hart did have knowledge. The facts known to Hart were that he had requested the license check; that he was waiting for dispatch to provide him with the results of that license check; and that if the check showed that Bodiford's license was valid, the traffic stop would be at an end and Bodiford would be free to go. Given this

_____

[4] The record shows that dispatch spoke with Hart at 6:46:13 p.m., when he contacted Black with Bodiford's license information. Thus, dispatch was not scheduled to make a status check of Hart until approximately 6:51:13 p.m. Black first attempted to contact the officer, however, at 6:48:45 p.m., approximately thirty seconds after entering into the CAD the information received on the return on Bodiford's driver's license and almost two minutes and thirty seconds before she was due to make a status check of Hart.

knowledge, and in the absence of any extenuating circumstances, the Fourth Amendment's requirement that Hart diligently pursue his investigation so as to minimize the time of a motorist's detention meant that Hart was required to respond promptly to any efforts by dispatch to contact him.

The State argues that despite his knowledge that he was awaiting the results of Bodiford's license check, Hart's decision not to respond to dispatch was reasonable because poor radio reception meant that Hart could not communicate with dispatch via his shoulder-mounted radio and that requiring Hart to leave Bodiford unattended while he used his car radio would have presented an unreasonable danger to the officer. This argument is not supported by the record.

We first note that the trial court did not make any factual finding that Hart and the dispatcher were in fact experiencing problems communicating with each other. Rather, the trial court's factual findings simply reflect the fact that Hart "advise[d] the dispatcher that he [was] in a bad area for radio traffic (i.e., cancels checks on him)."[5] Moreover, we have carefully reviewed the testimony of record, and neither Hart nor the dispatcher testified that they were actually experiencing problems communicating

---

[5] The trial court further found that "[t]he radio communication problem [could] be overcome by moving into the officer's car and using the car radio instead of the handheld device."

with each other. Instead, both testified only that radio service was known to be poor on that part of I-75 where the traffic stop occurred, and Hart further testified that "90 percent of the time" officers in that area would need to use the radio in their patrol car to speak with dispatch. Additionally, the video shows that Hart and the dispatcher had no difficulty communicating with one another via Hart's shoulder-mounted radio. The recording of the stop shows Hart standing on the side of the road, speaking into the radio and providing dispatch with Bodiford's driver's license information; the dispatcher does not indicate that she is having any problems understanding Hart, and she never asks Hart to repeat anything. Furthermore, the dispatcher can be heard very clearly on the radio attempting to contact Hart, and no static or other interference can be heard. Additionally, Hart had no problem communicating to dispatch that he was in a "bad spot" for radio.

Even construing the evidence as showing that Hart and the dispatcher were having problems communicating via Hart's shoulder-mounted radio, however, there was no evidence of any extenuating circumstances, such as concern for officer safety, that prevented Hart from responding to dispatch by using the radio in his patrol car. The record shows that by the time dispatch attempted to contact him, Hart had frisked Bodiford for weapons and had found none. Additionally, Bodiford, who cooperated

16

completely with Hart throughout the traffic stop, was standing away from his car and next to Hart's patrol car as instructed by Hart. Accordingly, given the lack of extenuating circumstances, the fact that Hart and dispatch may have had some problems communicating over Hart's shoulder-mounted radio did not relieve Hart of his responsibility to respond to dispatch before extending the traffic stop any further. The fact that Hart did not want to interrupt the process of retrieving the police dog, which was still in his patrol car, to respond to dispatch does not change this analysis.

Based on the facts of record, we find that Hart's conduct unreasonably prolonged the traffic stop of Bodiford and that, absent a valid reason for extending the stop beyond the investigation of the traffic violation, the search of Bodiford's car resulted from his illegal detention.

2. An officer may continue to detain a driver after the investigation of the traffic violation is complete only if the officer has "a reasonable, articulable suspicion that [the driver] was engaged in other illegal activity." *Valentine v. State*, 323 Ga. App. 761, 765 (2) (748 SE2d 122) (2013) (citation omitted). In its brief the State points to no evidence, other than the fact that the police dog alerted on Bodiford's car, that would support an extension of the traffic stop beyond its original scope. As explained in Division 1, however, the free air sniff occurred as a result of Hart's decision to

17

expand the traffic stop beyond its original purpose and it therefore cannot serve as a basis for Bodiford's continued detention. Moreover, Hart testified that if Bodiford's license check showed no problems with the license and no outstanding warrants for Bodiford, the traffic stop would be concluded and Bodiford would be free to go.

Additionally, Hart testified that he suspected that Bodiford was engaged in criminal conduct because of the extreme nervousness Bodiford displayed at the outset of the traffic stop. According to Hart, when he saw someone who displayed such signs of nervousness during a traffic stop, he took that as an indication that the person might be involved in illegal activity "and I'd like to investigate further." This Court, however, has repeatedly held that "nervousness alone cannot provide reasonable suspicion of criminal activity." *Bell v. State*, 295 Ga. App. 607, 610 (2) (672 SE2d 675) (2009) (footnote omitted). See also *Rosas v. State*, 276 Ga. App. 513, 516 (1) (b) (624 SE2d 142) (2005) ("[w]e have consistently held that 'nervousness alone' is not sufficient to establish reasonable suspicion to detain and investigate illicit drug activity") (footnote omitted); *State v. Harris*, 261 Ga. App. 119, 122 (581 SE2d 736) (2003) ("[n]ervousness in police presence, standing alone, provides no articulable suspicion" of criminal activity and cannot serve as the basis for prolonging a traffic stop) (footnote omitted); *Barraco v. State*, 244 Ga. App. 849, 852 (2) (b) (537 SE2d

114) (2000) ("[e]ven when other factors are present, nervous behavior of a person who has been stopped by an armed law enforcement officer is not an unusual response and is not necessarily strong evidence to support either reasonable suspicion or probable cause"). Accordingly, Hart had no basis for prolonging the traffic stop beyond the time reasonably required to complete his investigation of Bodiford's traffic violation. The search of Bodiford's car, therefore, resulted from an illegal detention. Given this fact, we reverse the order of the trial court and remand the case with direction to grant Bodiford's motion to suppress.

*Judgment reversed and case remanded with direction. Barnes, P. J., and Boggs, J., concur.*