**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 3, 2015**

# In the Court of Appeals of Georgia

A15A1460. SHEROD v. THE STATE.

DILLARD, Judge.

In this interlocutory appeal, Timothy Lewis Sherod challenges the trial court's denial of his motion to suppress evidence that was discovered after a traffic stop and subsequent search of the tractor-trailer he was driving. Sherod argues the court erred in denying his motion to suppress the evidence when (1) the traffic stop was unlawfully prolonged and lacked reasonable articulable suspicion, and (2) the drug-detection canine did not provide probable cause to search. For the reasons set forth *infra*, we affirm.

At the outset, we note that the Supreme Court of Georgia has reiterated three fundamental principles to follow in reviewing a ruling upon a motion to suppress.

First, the trial judge sits as the trier of fact at a hearing on a motion to suppress.[1] And because the trial judge hears the evidence, the judge's findings based upon conflicting evidence are "analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [them]."[2] Second, the trial judge's decision with regard to questions of fact and credibility "must be accepted unless clearly erroneous."[3] Finally, we (as the reviewing court) must construe the evidence "most favorably to the upholding of the trial court's findings and judgment."[4]

As to the first principle, our Supreme Court has further instructed that, "[t]o properly follow [it], we must focus on the facts found by the trial court in its order."[5] And here, the trial court made no written findings of fact in its order denying the

---

[1] *Miller v. State*, 288 Ga. 286, 286 (1) (702 SE2d 888) (2010).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.* at 287 (1) (emphasis omitted).

2

motion to suppress; however, the court orally announced its factual findings on the record at the conclusion of the hearing. As a result, we will now review those findings.[6]

We also note that the trial court's order reflects that its ruling was made "[u]pon consideration of all the evidence submitted, including testimony, documents, photos, and/or any other evidence that was *admitted* . . . ."[7] The record shows that during the hearing, without any objection, the State played a video recording of the traffic stop to refresh the officer's recollection of events,[8] and both the State and Sherod refer to this video in their appellate briefs and throughout their argument to

---

[6] *See Scruggs v. State*, 309 Ga. App. 569, 575 (4) (711 SE2d 86) (2011) (noting that, after listening to testimony at the motion-to-suppress hearing, "[t]he trial court then orally announced her factual findings on the record" and that, "[t]herefore, we apply the clearly erroneous standard to our review of this ruling").

[7] Emphasis supplied.

[8] *But see* OCGA § 24-6-612 (providing for the use of *written* materials to refresh recollection); *Russell v. State*, 295 Ga. 899, 903 (5) (764 SE2d 812) (2014) (declining to decide whether trial court erred by refusing to allow defendant to show a full video recording of forensic interview to refresh child witness's recollection).

the trial court below. Nevertheless, the video was not admitted into evidence at the

hearing and, as a result, no video was transmitted with the record on appeal.[9]

---

[9] *See* Court of Appeals Rule 18 (b) ("When the notice of appeal directs that transcripts of a trial or a hearing be included in the record, copies of all video or audio recordings that were introduced into evidence shall be transmitted to this Court along with the trial or hearing transcript. It shall be the responsibility of the party tendering the recordings at a trial or a hearing to ensure that a copy of the recording is included in the trial court record; however, it is the burden of the appealing party to ensure that a complete record is transmitted to this Court on appeal, including the transmission of video or audio recordings. . . ."). *Cf. Rodriguez v. State*, 295 Ga. 362, 368 (2) (b) n.11 (761 SE2d 19) (2014) ("[W]e note that a video recording of the traffic stop *was tendered in evidence* at the hearing below, but it does not appear in the record on appeal. We must assume, therefore, that the recording supports the decision of the trial court." (emphasis supplied)). We also note that Sherod's brief makes reference to facts that were not adduced at the motion-to-suppress hearing, citing to portions of the record that reflect photocopies of CDs and DVDs that contained discovery provided to Sherod by the State. We, of course, consider only the facts and evidence that were before the trial court when it ruled upon Sherod's motion to suppress. *See Paul v. Joseph*, 212 Ga. App. 122, 125 (2) (441 SE2d 762) (1994) ("Appellate courts will review only evidence presented to the trial court before its ruling on the motion. Additional evidence will not be admitted on appeal." (punctuation omitted)). However, in light of the parties' various references to material not included in the transmitted record, and out of an abundance of caution, this Court contacted the trial court to inquire about any audio or video recordings that might be missing. The trial court responded that its practice is to only send an appellate court CDs and DVDs that were admitted into evidence, and again, that there were no CDs or DVDs admitted into evidence in this case.

4

Turning to the facts of this case, the evidence before the trial court consisted of testimony from the K-9 officer who conducted the traffic stop, and that testimony showed that the officer was patrolling Interstate 20 in Douglas County on September 28, 2013. At approximately 9:15 a.m., the officer encountered Sherod's tractor-trailer and noticed it weave over the white fog line two times, at which point the officer initiated a traffic stop with the intention of checking Sherod's logbook to ensure that he had received adequate rest.

Upon approaching the tractor-trailer, the officer saw only one occupant, Sherod, the driver. But the officer also observed that the curtains to the sleeping compartment were closed and, when he questioned Sherod as to why they were closed, Sherod responded that he had a co-driver who was lying down on the bunk.[10] The officer then requested to see Sherod's license, logbook, and bill of lading, and he found it unusual when Sherod retrieved the documents from behind the sleeper curtain, keeping the curtain closed while doing so. He also observed that Sherod was nervous during this exchange, with heavy breathing and shaking hands.

---

[10] The co-driver was later identified as Jerry Coles. While Coles and Sherod were jointly indicted, and although Coles joined in Sherod's motion to suppress, he is not a party to this appeal.

After receiving the requested documents, the officer asked Sherod to exit the tractor-trailer while he reviewed them. Then, after Sherod had done so and was standing at the back of the truck, the officer walked back to the cab and asked to speak with the co-driver. As the co-driver emerged from the sleeper compartment, the officer noticed that he too kept the curtain tightly closed. Thereafter, the officer took the co-driver's license and logbook to review as well.

While reviewing the two logbooks, the officer noticed that on at least one occasion during the drivers' trip to and from California,[11] both were listed as being off duty or in the sleeper compartment at the same time. The officer was suspicious of these notations because, in his experience, when a driver transports a load of perishable produce with a co-driver (as Sherod was doing), "the wheels never stop turning." Thus, the officer found it odd that during these periods, there were no notations that the truck was being loaded, unloaded, waiting to be loaded, or waiting for a warehouse to open when nobody was driving.

---

[11] The officer testified that he looked back "a couple of weeks prior to the stop because [the driver is] supposed to maintain the logbook for a 30-day period." Accordingly, the officer started to examine the books as far back as September 1, 2013.

Specifically, the logbooks show that beginning at 1:00 a.m. on September 25, both drivers were in the sleeper compartment, with Sherod in the compartment for a 10-hour period and the co-driver in the compartment for a nearly 24-hour period. There was, then, at least a 10-hour period in which no one was driving the truck. Sherod apparently explained this as having occurred when a particular pickup destination closed early.[12] But the officer thought this explanation strained credulity because, in his experience, logbooks generally note when a truck is waiting to be loaded or unloaded, or for a warehouse to open; and the officer found it hard to believe that the truck was not loaded until 11:00 a.m. after waiting all night to unload. Thus, according to the officer, this information in the logbooks, coupled with the drivers' nervous behavior related to keeping the sleeper-compartment curtain closed, caused him to "believe that there might be something else going on."

In addition to reviewing the logbooks, the investigating officer also asked another officer who arrived on scene to run a check on the drivers' licenses, and was advised that both individuals had prior criminal histories, with drug-related

_____

[12] The officer did not speak with the co-driver and, thus, did not hear his explanation.

7

convictions on the part of the co-driver in 1994 and 1998.[13] The officer also recalled that the load on the truck was not "sealed,"[14] which he also found to be unusual. The officer explained that whether or not a load is sealed depends upon the shipping company, which means that it may or may not be unusual to find an unsealed load and that "there are occasions where it's not [unusual]." But "more times than not" with shipments of produce, even in situations with partial pickups at several locations, the load will be sealed between destinations.

After reviewing the logbooks, the officer decided to issue a written warning citation to Sherod.[15] The officer testified that at the point when he returned Sherod's documents and issued the written citation, Sherod was *not* free to leave. And immediately after issuing the citation, the officer asked Sherod for consent to search the truck, which Sherod did not give. The officer then asked for permission to walk

---

[13] It is unclear from the testimony exactly when the other officer arrived, but at least two other officers arrived in separate patrol cars before Sherod was issued a citation. The officer testified that their arrival was due to a policy that requires "at least two officers to search a vehicle."

[14] According to the officer, a seal "secures the integrity of the load, makes sure nobody's messing with the load while it's in transit, or moving narcotics in and out of a load of produce and contaminating it with germs or dirt or whatever else."

[15] Although the record does not specify, this citation was presumably for Sherod's alleged failure to maintain lane.

his K-9 dog around the truck, and when Sherod did not give consent for that either, the officer informed Sherod that he nevertheless intended to detain the drivers to walk the dog around the truck.

According to the officer, this detention—which occurred approximately 32 minutes after the initial stop began—lasted approximately two minutes because as soon as the K-9 was released from the patrol car and walked up to the truck, the dog alerted to the presence of illegal contraband and sat at the entrance to the sleeper compartment. Thereafter, a search of the sleeper compartment revealed two boxes and two large bags filled with more than 200 pounds of marijuana. The drivers were immediately arrested and later indicted for trafficking marijuana.

At the motion-to-suppress hearing, the officer explained that he decided to conduct a K-9 sniff due to the inconsistencies in the drivers' logbooks, Sherod and the co-driver's nervous/suspicious behavior, the fact that the truck's load was not sealed, the co-driver's criminal drug history, and the officer's years of drug interdiction experience. And at the conclusion of the hearing, the trial court denied the motion to suppress and found that, based upon the drivers' suspicious behavior related to the curtain on the sleeping compartment, the co-driver's criminal drug history, the inconsistency in the logbooks as compared to what the officer would

9

normally expect to see, and the lack of a seal on the load, the officer had reasonable articulable suspicion of criminal activity so as to warrant further detention to conduct a K-9 sniff of the vehicle. We granted Sherod's application for interlocutory appeal, and this appeal follows.

1. Although Sherod's enumerations of error reflect a contention that "the trial court erred by holding that law enforcement did not unlawfully prolong the initial traffic stop to perform a search of the vehicle," his somewhat convoluted argument devoted to this enumeration asserts both that the initial stop was prolonged and that the officer lacked reasonable articulable suspicion of criminal activity to perform a K-9 sniff of the vehicle.[16]

---

[16] Sherod also contends in conclusion that officers "violated the Fourth Amendment when they pursued an investigation into a minor traffic violation as a ruse to obtain access to the interior of a vehicle to confirm [an] anonymous tip about alleged drug activity." Sherod also made this same argument to the trial court. But any facts as to an "anonymous tip about alleged drug activity" were *not* adduced at the motion-to-suppress hearing and, thus, were not considered by the trial court. As further addressed in footnote 9, *supra*, in support of these facts, Sherod cites to photocopies of CDs and DVDs of reciprocal discovery, *not* to the transcript of the motion-to-suppress hearing. And none of these alleged facts were a basis for the trial court's ruling on the motion to suppress, as belied by the court's findings on the record. Furthermore, the court noted that "[t]he initial stop is apparently not in contest here," before making its finding that there was reasonable articulable suspicion to further detain the defendants to conduct a K-9 sniff. Nevertheless, we note that it is well established that "[w]hen an officer observes a traffic law violation, the resulting stop is not pretextual." *Worlds v. State*, 328 Ga. App. 827, 831 (1) (762 SE2d 829)

10

On a motion to suppress contraband discovered during a search and seizure, the State bears the burden of proving that the search and seizure were lawful.[17] Thus, on a motion to suppress evidence discovered during a traffic stop, "the State bears the burden of proving that the search of the car was lawful, and to carry this burden, the State must show that it was lawful to detain [the defendant] until the time the drug dog indicated the presence of drugs."[18] With these guiding principles in mind, we will now address Sherod's contentions.

---

(2014) (punctuation omitted). And here, the officer initially stopped Sherod's tractor-trailer after observing a failure to maintain its lane of travel. *See* OCGA § 40-6-48 (1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety . . . .").

[17] OCGA § 17-5-30 (b); *see Davis v. State*, 266 Ga. 212, 213 (465 SE2d 438) (1996) ("Once a motion to suppress has been filed, the burden of proving the lawfulness of a warrant is on the state and that burden never shifts. The only burden upon the challenger of a search warrant is that of producing evidence to support his challenge, which burden is shifted to him only after the state has met its initial burden of producing evidence showing the validity of the warrant." (citations omitted)).

[18] *Bodiford v. State*, 328 Ga. App. 258, 261 (1) (761 SE2d 818) (2014) (punctuation omitted); *accord Dominguez v. State*, 310 Ga. App. 370, 372 (714 SE2d 25) (2011).

Sherod first argues that the investigating officer violated his Fourth Amendment[19] rights by prolonging the traffic stop. The Supreme Court of Georgia has recently explained that there are two categories of claims that an officer illegally prolonged a traffic stop.[20] In the first category are cases in which the officer allegedly extended the stop "beyond the conclusion of the investigation that warranted the detention in the first place."[21] And in the second category of cases, the detention has not been extended beyond the conclusion of the original investigation but, rather, "it is claimed that the investigation took too long."[22] In this second category of cases, courts examine whether the police "'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was

---

[19] *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); GA. CONST. art. 1, § 1, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the person or things to be seized.").

[20] *See Rodriguez v. State*, 295 Ga. 362 (761 SE2d 19) (2014).

[21] *Id.* at 369 (2) (b).

[22] *Id.*

necessary to detain the defendant.'"[23] In *either* category, the touchstone of our analysis is the *reasonableness* of the officer's conduct.[24] In other words, we ask whether the officer's conduct in prolonging the stop was reasonable "given the objective facts known to the officer and the circumstances under which he was working."[25] And the question of the reasonableness of this conduct is, of course, a question of law.[26]

Sherod appears to conflate these two scenarios, in turns arguing that the investigating officer took too long to pursue the original purpose of the traffic stop and also that, after issuing a warning citation, the officer illegally extended the stop beyond the conclusion of the initial investigation. But at the hearing (and now on appeal), the State did not dispute that after the officer issued the written citation to Sherod, a second detention began. And, as further discussed *supra*,[27] the trial court

---

[23] *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (II) (B) (105 SCt 1568, 84 LE2d 605) (1985)).

[24] *Bodiford*, 328 Ga. App. at 261 (1).

[25] *Id.* at 261-62 (1).

[26] *Id.* at 262 (1).

[27] *See supra* footnote 16.

believed that the initial stop was not at issue and therefore, the question before the court was whether the officer had reasonable articulable suspicion to further detain Sherod while his K-9 sniffed the tractor-trailer.[28] Thus, because there was no finding that a second detention began earlier than at the point the warning was issued, and Sherod has not made a cogent argument or pointed to evidence of same,[29] we will only consider whether the investigating officer had reasonable articulable suspicion of other illegal activity to justify further detaining Sherod after concluding the initial stop.

---

[28] *See Rodriguez v. United States*, __ U.S. __, __ (II) (135 SCt 1609, 191 LE2d 492) (2015) (holding that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," and remanding to lower court for consideration of whether detention for dog sniff was supported by individualized suspicion).

[29] As previously discussed, many of Sherod's arguments rely upon facts that were not adduced at the motion hearing and are not reflected in the record—either because Sherod cites to photocopies of CDs and DVDs that contained discovery, or because Sherod (and the State) cite to the video recording of the traffic stop, which the State failed to admit into evidence notwithstanding its reliance upon same. Nevertheless, it appears undisputed by the record evidence that *is* before us that in the approximately 30 minutes before issuing the warning citation, the investigating officer reviewed the drivers' pertinent documents and questioned Sherod, and we have previously held that a period of approximately 30 minutes was not an inappropriate amount of time to pursue the initial investigation of a traffic stop of a tractor-trailer by reviewing pertinent documents and questioning the driver. *See Valentine v. State*, 323 Ga. App. 761, 763, 765 (2) (748 SE2d 122) (2013).

It is well established that after the tasks related to the investigation of the traffic violation and processing of the traffic citation have been accomplished, "an officer cannot continue to detain an individual without [reasonable] articulable suspicion."[30] And reasonable articulable suspicion requires "a particularized and objective basis for suspecting that a citizen is involved in criminal activity."[31] This suspicion need not meet the higher standard of probable cause, but it must only be more than mere caprice or a hunch.[32] In assessing whether a reasonable articulable suspicion exists, "courts must look to the totality of the circumstances"[33]—*i.e.*, "objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers."[34]

---

[30] *Weems v. State*, 318 Ga. App. 749, 751 (2) (734 SE2d 749) (2012) (punctuation omitted); *accord Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002).

[31] *State v. Whitt*, 277 Ga. App. 49, 50 (625 SE2d 418) (2005); *accord Padron v. State*, 254 Ga. App. 265, 268 (1) (562 SE2d 244) (2002).

[32] *Whitt*, 277 Ga. App. at 50; *Padron*, 254 Ga. App. at 268 (1).

[33] *State v. Thompson*, 256 Ga. App. 188, 189 (569 SE2d 254) (2002).

[34] *State v. Causey*, 246 Ga. App. 829, 832 (1) (b) (540 SE2d 696) (2000) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (101 SCt 690, 66 LE2d 621) (1981)).

15

Here, the trial court determined that the investigating officer had reasonable articulable suspicion of other illegal activity based upon the drivers' suspicious behavior related to the curtain on the sleeping compartment, the co-driver's criminal drug history, the inconsistency in the logbooks as compared to what the officer would normally expect to see, and the lack of a seal on the load. We agree.

At the time the officer decided to detain Sherod to conduct a K-9 sniff, he knew the following: that a co-driver had been lying down to rest behind the closed curtain of the tractor-trailer's sleeping compartment when Sherod stopped and when he retrieved the requested documentation; that Sherod retrieved the requested documentation from *behind* the closed curtain, which was, in the officer's experience, unusual; that the co-driver kept the curtain closed when he later emerged from the sleeping compartment; that the co-driver had two drug-related criminal convictions dating back to 1994 and 1998; that the cargo load was not sealed; and that on one occasion during a cross-country trip to California and back to Georgia, neither driver was behind the wheel for one 10-hour period, which was, in the officer's experience, unusual when transporting perishable goods.

16

As to the sleeping compartment, the officer found both drivers' behavior with regard to the closed curtain suspicious.[35] And with regard to the logbooks, the officer noticed that Sherod was nervous while retrieving the documents from behind the closed curtain, and the books showed at least one unusual 10-hour period during which no one was driving the vehicle with no notation that the truck was waiting to be loaded, unloaded, or for a warehouse to open.[36] Then, as far as the lack of a seal

---

[35] *See Hardaway v. State*, 309 Ga. App. 432, 433 (1) (710 SE2d 634) (2011) (affirming denial of motion to suppress when driver "shoved his arm between the console and the driver's seat up to his elbow" and "it appeared that [the driver] was trying to conceal something" but driver told officer "he was looking for his wallet but ultimately retrieved it from the driver's side visor"); *Jones v. State*, 259 Ga. App. 849, 850 (578 SE2d 562) (2003) (affirming denial of motion to suppress when, while initiating traffic stop, officer observed driver reach under passenger seat and appear to forcibly push something under with his arm, causing officer to believe driver was hiding something).

[36] *See Valentine*, 323 Ga. App. at 762, 765 (1) (affirming denial of motion to suppress when logbook showed excessive downtime and an unexplained detour); *United States v. Gonzales*, 342 Fed. Appx. 446, 449 (IV) (11th Cir. 2009) (affirming conviction after denial of motion to suppress when officer developed reasonable articulable suspicion of illegal activity based upon, *inter alia*, "extreme nervousness" displayed by both drivers and inconsistencies between the drivers' logbooks and their individual statements to the officer); *United States v. Monzon-Gomez*, 244 Fed. Appx. 954, 960-61 (III) (B) (11th Cir. 2007) (affirming the denial of motion to suppress when drivers gave conflicting explanations for where they were coming from, and documentation did not list a delivery destination in current state or reflect a scheduled delivery that would confirm one driver's explanation for their route); *United States v. Rodriguez*, Crim. Case No. 1:10–CR–0407–TWT–JRK–3, 2011 WL 5191805, at *4 (N.D. Ga. 2011) (denying motion to suppress when logbook did not contain any

was concerned, the officer testified a seal would generally be present when hauling a load of perishable goods.[37] Finally, the co-driver's two drug-related criminal convictions, when considered together with all of the other information available to the officer at the time of Sherod's detention, "contributes powerfully to the reasonable suspicion calculus."[38] We must also be mindful that our totality-of-the-circumstances

notation of a stop in Atlanta, although officer knew from other sources that the driver had stopped there, and approximately four hours were wholly unaccounted for in logbook and driver had no explanation for the extra travel time).

[37] *See Monzon-Gomez*, 244 Fed. Appx. at 957 (II), 961 (III) (B) (affirming denial of motion to suppress when door to refrigerated trailer was locked with a suspicious combination lock instead of the seal that officer knew was "supposed" to be on door); *Rodriguez*, Crim. Case No. 1:10–CR–0407–TWT–JRK–3, 2011 WL 5191805, at *4 (denying motion to suppress when bill of lading and seal both reflected inconsistencies with normal operating procedures when a computer-generated seal was marked through with pen and a handwritten seal was placed above, and that type of seal could be purchased at any truck stop and was not the type issued by the company from which it was purportedly received; trailer was also locked with a titanium bolt seal that would require bolt cutters and would prevent law enforcement from getting inside without same).

[38] *United States v. Santos*, 403 F3d 1120, 1132 (II) (b) (2) (e) (10th Cir. 2005); *see Brown v. State*, 269 Ga. 830, 832-33 (2) n.2 (504 SE2d 443) (1998) (listing as "reasonably-founded suspicious factors" the following: "*an officer's knowledge of past criminal involvement by individuals inside the stopped vehicle*; irregularities in licensing and insurance documentation or the driver's authority to be operating the stopped vehicle; and the location where the stop occurred" (emphasis supplied)); *Giles v. State*, 284 Ga. App. 1, 4 (1) (642 SE2d 921) (2007) (considering prior arrest history as a relevant factor in totality of circumstances analysis). *Cf. Martin v. State*, 316 Ga. App. 220, 226 (2) (729 SE2d 437) (2012) (holding that "a past *arrest* for

18

analysis includes information available to the officer concerning "the modes or patterns of operation of certain kinds of lawbreakers,"[39] and that from such experience and training, an officer "draws inferences and makes deductions . . . that might well elude an untrained person."[40]

Thus, viewing the totality of the circumstances, as we must,[41] we agree with the trial court that the officer had reasonable articulable suspicion.

2. Sherod next argues that the trial court "erred by not giving sufficient weight to evidence that the drug dog detection canine used by law enforcement did not provide probable cause to search the vehicle." In an equally confusing explanation, Sherod asserts that the search of the tractor-trailer was unlawful because "(1) the underlying traffic stop was unlawfully prolonged; and (2) [the officer's] use of his canine raised doubts as to the canine's ability to adequately detect odors of unlawful chemical compounds."

---

possession, without more, is simply not enough to provide reasonable articulable suspicion that the person is currently in possession").

[39] *Evans v. State*, 262 Ga. App. 712, 716 (1) (b) (586 SE2d 400) (2003) (punctuation omitted)

[40] *Id.* (punctuation omitted); *accord Giles*, 284 Ga. App. at 4 (1).

[41] *See supra* note 33 and accompanying text.

We reject the first contention for the reasons set forth in Division 1 *supra*. As to the second argument, Sherod further clarifies in his reply brief that he "does not argue that [the officer's] drug detection canine was not qualified to perform any type of search, merely that in this particular case, the conduct of the canine and/or [the officer] rendered the search invalid." Sherod appears to assert that the officer may have influenced his canine to alert to drugs. However, as we have previously held, whether a drug-detection dog "in fact alerted . . . was a question of fact for the trial court, which we must accept unless clearly erroneous."[42] There being no indication of same, this enumeration of error is wholly without merit.

Accordingly, for all of the foregoing reasons, we affirm the trial court's denial of Sherod's motion to suppress.

*Judgment affirmed. Ellington, P. J., and McFadden, J., concur.*

---

[42] *McKinney v. State*, 326 Ga. App. 753, 756 (1) (755 SE2d 315) (2014).