**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A0796. WATTS v. THE STATE.

BRANCH, Judge.

Following a bench trial at which he stipulated to both the facts and the sufficiency of the evidence, Monquezias Watts was convicted of a single count each of possession of marijuana with intent to distribute, possession of a firearm during the commission of a felony, and theft by receiving. The trial court sentenced Watts to eight years, but probated the sentence. After Watts failed to comply with conditions of his probation, the trial court revoked his probation and remanded him to custody. Following the revocation of his probation, Watts sought and was denied an appeal bond. Watts now appeals his conviction, the revocation of his probation, and the denial of his appeal bond. With respect to his conviction, Watts claims that the trial court erred in denying his motion to suppress evidence discovered by police after they

illegally detained Watts following a traffic stop. As to the revocation of his probation, Watts argues that the trial court erred when it held that his notice of appeal did not act as a supersedeas, preventing the enforcement of his probationary conditions. Finally, Watts contends that the trial court abused its discretion in denying his motion for an appellate bond.

For reasons explained more fully below, we find that the trial court erred in concluding that the free-air sniff which resulted in the seizure of drugs and contraband did not violate the Fourth Amendment because it occurred during a de minimis extension of the traffic stop. Accordingly, the court erred in denying Watts's motion to suppress. We therefore vacate both the order denying the motion to suppress and the judgment of conviction and remand the case for further proceedings. We further find that Watts's second and third claims of errors are based on orders that were entered after Watts filed his notice of appeal from the judgment of conviction. Given this fact, and given that Watts never filed a notice of appeal as to the orders revoking his probation and denying his appellate bond, we lack jurisdiction to address Watts's second and third claims of error.

> At a hearing on a motion to suppress, the trial judge sits as the trier of fact. On appeal from the grant or denial of such a motion, therefore, this

2

Court must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous. However, we owe no deference to the trial court's conclusions of law and are instead free to apply anew the legal principles to the facts.

*Bodiford v. State*, 328 Ga. App. 258, 258 (761 SE2d 818) (2014) (citations and punctuation omitted). See also *Jones v. State*, 291 Ga. 35, 36-37 (1) (727 SE2d 456) (2012) (where "the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts").

The relevant facts in this case are undisputed. At approximately 1:30 a.m. on June 16, 2012, Sergeant Wayne Franco of the Woodstock Police Department initiated a traffic stop of a vehicle driven by Tremayne Gay and in which Watts, Chasmine Johnson, and Alma Rico were passengers. Two video recordings of this stop and the subsequent police investigation, including the police search of Gay's truck, were introduced into evidence and shown at the motion to suppress hearing.

Franco initiated the stop after observing that the license plate on Gay's truck was covered by a piece of tinted plastic, in violation of OCGA § 40-2-11. Franco testified that he became suspicious of the individuals in the truck because Gay

3

continued to drive the truck for approximately two blocks before pulling to the side of the road. After viewing the video recorded by his patrol-car camera, however, Franco acknowledged that Gay had pulled over at the first opportunity he had to do so, without having to make a left hand turn across traffic. Additionally, the video recording of the stop shows that Gay pulled to the side of the road and came to a stop approximately 33 seconds after Franco activated the blue lights on his patrol car.

When Franco approached Gay's truck, both Gay and Watts, who was the front-seat passenger, were smoking cigars that appeared to be freshly-lit. Franco explained that, in his experience, people in possession of drugs will often "chain smoke" either cigarettes or cigars to mask the odor of any contraband. Franco further testified that Gay appeared to have what he described as "a little cotton mouth" and the eyes of both men appeared bloodshot. Based on these observations, Franco believed there was a possibility that both men were "under the influence of marijuana." Franco acknowledged, however, that he saw no signs that Gay's driving was impaired or that Watts was impaired by either drugs or alcohol. Additionally, no investigation was conducted into whether Gay was under the influence of any controlled substance. While some investigation may have been made into whether Watts was impaired, the State provided no evidence at either the motion to suppress hearing or at trial showing

4

that Watts was under the influence of either alcohol or drugs at the time of the traffic stop. And as discussed below, the video of the traffic stop shows that police were prepared to allow Watts to drive Gay's car from the scene.

Immediately after making contact with Gay, Franco explained to him the reason for the stop and asked both Gay and Watts to provide Franco with their driver's licenses. The men did so, and Franco returned to his patrol car and relayed the license information to dispatch. Less than one minute later, dispatch reported that Gay's license had been revoked, that Watts's license was valid, and that neither man had any outstanding warrants. After receiving this information, Franco remained in his patrol car for approximately two and one-half minutes, awaiting the arrival of a second officer, Eric Maddox. Approximately one minute after Maddox's arrival and approximately seven and one-half minutes after the traffic stop began, police arrested Gay for driving without a license and also charged him with a misdemeanor tag violation. Following his arrest, police questioned Gay about his passengers and where they lived, as well as about the contents of Gay's car. During this process, Maddox and/or Franco twice asked Gay whether he would consent for Watts to drive Gay's truck from the scene; each time the officers asked this question, they informed Gay

5

that Watt's license had returned as valid. Both times he was asked, Gay responded that Watts had his permission to drive the truck from the scene.

After completing the arrest process for Gay, which included questioning him, inventorying his pockets, handcuffing him, and placing him in the back of Maddox's patrol car for transport, Franco returned to the truck and its three remaining passengers. Rather than returning Watts's license to him and informing him he had permission to drive the truck, however, Franco asked Watts to exit the vehicle. Watts complied with this request, exited the vehicle with his hands in front of him, and consented to a search of his person. Franco then asked Watts to accompany him, and the two men stood next to a patrol car while Franco questioned Watts about his relationship to Gay, how well Watts knew the female passengers, what activities the group had engaged in that night, and the contents of the truck. According to Franco, Watts appeared nervous and when questioned, Watts told the officer that Gay was a friend of the family. Gay, however, told the officer that Watts was his stepson.[1]

Following his interview of Watts, Franco instructed Watts to remain next to the patrol car, and he returned to the truck and told the women they needed to exit the

---

[1] The evidence at the motion to suppress hearing showed that Gay was, in fact, the then-boyfriend of Watts's mother, but the couple was not married.

vehicle because the police needed to search it for alcohol.[2] Franco also instructed the women to leave their personal belongings in the truck and asked for and received permission to search those belongings.[3]

After having the women exit the vehicle, and approximately 14 minutes into the traffic stop and between six and seven minutes after Gay's arrest, Franco asked the women for identification. When both women replied they had no identification with them, Maddox asked each woman for the correct spelling of her name and her date of birth. Each of the women provided that information, with Johnson explaining that she had a South Carolina driver's license and Rico stating that she lived in South Carolina. Franco provided this information to dispatch and asked the dispatcher to run a check in both Georgia and South Carolina. Approximately ten seconds later, dispatch responded that Johnson had a valid South Carolina driver's license and that

---

[2] It is unclear on what basis the police planned to justify their search of the vehicle for alcohol. Alcohol is not an illegal substance and Gay, the owner and driver of the vehicle, was over the age of 21, as was Watts, the person to whom the vehicle was to be released. Additionally, there was no evidence that the officers believed that any of the passengers were under the influence of alcohol or that the officers detected the odor of alcohol coming from the vehicle, thereby indicating that an open container might be present. Nor was there any evidence that officers saw an open container of alcohol in the vehicle.

[3] Both women had a purse with them and Rico also had what she described as a "travel bag."

she had no outstanding warrants, but that there was "no return" on Rico. In other words, the check indicated that Rico, who was 18 years-old at the time, had no driver's license, no state-issued identification, no criminal record, and no outstanding warrants. Police then proceeded to question Rico about her lack of identification. During questioning, Rico stated that she had either a passport or a visa in her purse. Rico again consented to the search of her purse and told police in which area of the bag her travel documents could be found. When police found these documents, the name and date of birth thereon matched the information provided earlier by Rico, and which showed that Rico had no outstanding warrants. At that point, police were satisfied that they knew Rico's identity and legal status.

While Franco was running the identity checks of Johnson and Rico, Maddox read Gay his *Miranda* rights and then asked Gay for permission to search his truck. Gay refused consent, and Maddox relayed this information to Franco. Franco then requested a K-9 unit to come to the scene just before he began his search of Rico's bag for her identification documents. Approximately two minutes after police had finished ascertaining the identity and legal status of all of the truck's passengers, the K-9 unit arrived on the scene. Approximately two minutes later, and 14 to 15 minutes after the conclusion of Gay's arrest and the police determination that Watts could

8

drive Gay's car from the scene, the dog's handler had the dog perform a free-air sniff around Gay's truck. The dog alerted on the truck, and when police allowed him into the vehicle, the dog alerted on a black backpack. Police removed the backpack from the truck, searched it, and found it contained some amount of marijuana[4], a package of plastic sandwich bags, scales of the kind used to weigh drugs, and a nine-millimeter handgun. When police ran a computer check on the gun's serial number, they discovered the gun had been reported stolen from a residence in Gwinnett County.

Prior to trial, Watts moved to suppress the evidence seized from Gay's truck on the grounds that the discovery of that evidence had resulted from an illegally prolonged traffic stop. Following an evidentiary hearing, the trial court denied that motion without explanation. The trial court certified its order for immediate review, and this Court granted Watts's application for an interlocutory appeal. We subsequently dismissed that appeal as improvidently granted and remanded the case back to the trial court. On remand, the case proceeded to a bench trial, after which Watts was convicted.

---

[4] The State offered no evidence, either at the motion to suppress hearing or at trial, to show the amount of marijuana found in the backpack.

Watts filed his notice of appeal from the judgment of conviction on March 21, 2014. On September 11, 2014, the State filed a petition to revoke Watts's probation. The trial court granted that motion and issued a warrant for Watts's arrest. After his arrest, Watts filed a motion to dismiss the probation warrant, arguing that the notice of appeal of his conviction served as a supersedeas and therefore stayed execution of his sentence. Thus, Watts reasoned that he was not subject to the terms of his probated sentence during the pendency of his appeal. The trial court held a hearing on Watts's petition and thereafter denied the same in an order entered on October 16, 2014. Watts then filed a motion for an appeal bond. Following a hearing on that motion, the trial court denied bond in an order entered on December 11, 2014. Watts did not file a notice of appeal from either the order denying his motion to dismiss the probation warrant or the order denying his motion for an appeal bond.

1. We first address whether the trial court erred in denying Watts's motion to suppress. On a motion to suppress, the State bears the burden of proving that the search at issue did not violate the Fourth Amendment. *Dominguez v. State*, 310 Ga. App. 370, 372 (714 SE2d 25) (2011). To carry its burden in this case, the State was required to show that it was legal to detain Watts at the scene until the drug dog indicated the presence of drugs. Id. Specifically, the State needed to prove that the

10

police officers did not extend the stop of Gay's truck "beyond the conclusion of the investigation that warranted the detention in the first place," i.e., that the officers did not prolong the stop after concluding their investigation of Gay's tag violation. *Rodriguez v. State*, 295 Ga. 362, 369 (2) (b) (761 SE2d 19) (2014) (citation omitted). Alternatively, the State could meet its burden by showing that the investigating officers had "a particularized reason to suspect that [Watts was] engaged in some other criminal activity." *Dominguez*, 310 Ga. App. at 372.

(a) Watts contends that the trial court erred in denying his motion to suppress on the grounds that the free-air sniff of Gay's truck involved only a brief extension of the traffic stop. We agree.

At the hearing below, the State argued, and the trial court found, that the traffic stop was not complete until the police had ascertained the identity of and run a warrant check on each of Gay's passengers. The State argued that such an identity and warrant check was justified by officer safety concerns. We assume for purposes

11

of this appeal that the State's argument is correct.[5] See

[5] We note that in denying the motion to suppress, the trial court found that because Gay's truck was being released to Watts and the two female passengers, police did not act unreasonably in determining the identity of all those persons to whom they were releasing the vehicle. In doing so, the court expressly rejected the State's argument that the identity and warrant checks were justified by officer safety concerns. Specifically, the court made a credibility determination and found that despite Franco's testimony as to his safety concerns, the evidence failed to show that such concerns justified Franco's insistence on prolonging the traffic stop for the sole purpose of determining the identity of the two female passengers. The record shows that Franco testified that at the time he ran the warrant search on the female passengers, neither had done anything illegal and he had no basis for believing that either was engaged in illegal activity. At the time the traffic stop otherwise would have concluded (following Gay's arrest and the determination that Watts had a valid license and was authorized to drive the car from the scene), police had asked for and received permission to search Watts's person and, as reflected by the videos of the traffic stop, all three passengers had readily complied with all instructions given by both of the officers at the scene.

It may be that in light of the Georgia Supreme Court's recent decision in *State v. Allen*, ___ Ga. ___ (2) (c) (Case No. S14G1765, decided Nov. 2, 2015), the trial court erred in making a factual finding as to whether officer safety concerns existed and prompted the officer's insistence on confirming the identity of the two female passengers. See *Allen*, ___ Ga. at ___ (2) (d) (indicating that as a matter of law, officer safety concerns always justify an identity and warrant check of all passengers in an automobile that is the subject of a traffic stop, noting "[a]n officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped") (citation and punctuation omitted). Given that the circumstances of this case do not require us to decide that question, however, we decline to do so. Instead, in accordance with *Allen*, we have assumed that officer safety concerns were present and that the traffic stop was not complete until police had ascertained the identity and warrant status of all passengers. In making this assumption, however, we note that the traffic stop at issue, including the identity and warrant check of all passengers, was indisputably complete before the dog sniff occurred. Thus, this case does not require us to determine whether the officer's delay in checking the identity and legal status of the female passengers until all other tasks related to the stop

*State v. Allen*, ___ Ga. ___ (2) (c) (Case No. S14G1765, decided Nov. 2, 2015) ("identification checks of both drivers and passengers are generally permitted as an officer safety measure during a traffic stop"); *Rodriguez*, 295 Ga. at 372-373 (2) (b) (as a general rule, a check of the passengers' identity at the outset of a traffic stop is justified as in the interests of officer safety).

As the State conceded at the motion to suppress hearing, the undisputed evidence in this case shows that the traffic stop was complete, at the latest, at the time police were satisfied they knew Rico's identity and legal status. See *Faulkner v. State,*

_____

(including the arrest of Gay, the search of Watts, and the determination that Watts had both a valid license and Gay's permission to drive his truck from the scene) illegally prolonged the stop. See *Rodriguez v. United States*, ___ U. S. ___ (II) (135 SCt 1609, 1615-1616, 191 LEd2d 492) (2015) (recognizing that traffic stops are "fraught with dangers to officers" and that "the government's officer safety interest stems from the mission of the stop itself," but further stating that "safety precautions taken in order to facilitate" an "[o]n-scene investigation into other crimes" do not fall within the "mission of the traffic stop" and explaining that the Fourth Amendment requires "that an officer always has to be reasonably diligent. . . . [and] *diligence [is] gauged . . . by noting what the officer actually did and how he did it*[.] If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission. As we . . . reiterate today, a traffic stop prolonged beyond that point is unlawful.") (Emphasis supplied; punctuation omitted.) Nor does this case require us to consider whether *Allen* forbids Georgia courts from making such a determination. See *Allen*, ___ Ga. at ___ (2) (d) ("The sequence of the officer's actions during a traffic stop is not determinative; instead, the primary question is whether the activity at issue was related to the mission of the stop. . . . If . . . the task is a component of the traffic-stop mission, it may be done at any point during the stop. It does not matter if a mission-related activity takes place as soon as the stop begins or, as is the case here, after other mission-related activities have been completed.")

256 Ga. App. 129, 130 (567 SE2d 754) (2002) (as a matter of law, a traffic stop is complete "once the tasks related to the investigation of the traffic violation . . . have been accomplished"). Thus, the record is undisputed that the traffic stop had concluded approximately four minutes before police conducted the free-air sniff. The trial court acknowledged that fact, but nevertheless concluded that the continued detention of Watts and the female passengers did not violate the Fourth Amendment. The court based this conclusion on the law holding that a brief or de minimis extension of a traffic stop does not violate the Fourth Amendment. See *Rodriguez*, 295 Ga. at 371 (holding that the length by which the police prolonged the detention "is relevant to [the] inquiry" of whether the detention violated the Fourth Amendment), citing *United States v. Digiovanni*, 650 F3d 498, 509 (II) (4th Cir. 2011) ("where a delay can be characterized as de minimis under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation") (citations omitted); *Young v. State*, 310 Ga. App. 270, 273 (712 SE2d 652) (2011) ("[i]n the end, the question is 'whether [the detention] was appreciably prolonged," considering "the detention as a whole,' and keeping in mind that 'the touchstone of our inquiry [under the Fourth Amendment] is reasonableness'"), quoting *United States v. De La Cruz*, 703 F3d 1193, 1203 (I) (A) (10th Cir. 2013).

14

The United States Supreme Court, however, recently rejected the concept that the Fourth Amendment allows any kind of extension of a traffic stop beyond the investigation of the traffic violation that warranted the stop, even if that extension could be considered minimal. *Rodriguez*, 135 SCt at 1615-1616.[6] In that case, the drug dog had arrived within five minutes after the police had completed all tasks related to the traffic stop and the dog alerted on the car one to two minutes later. Id. at 1613. Following his indictment on possession with intent to distribute methamphetamine, Rodriguez moved to suppress the drugs found in his car arguing that the free-air sniff around the vehicle resulted from an illegally prolonged traffic stop. The trial court denied Rodriguez's motion, relying on precedent holding that "'dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions.'" Id. at 1613-1614. Applying that law, the trial court concluded that "the '7 to 10 minutes' added to the stop by the dog sniff 'was not of constitutional significance.'" Id. at 1614. The Eighth Circuit affirmed this ruling, finding that the delay at issue "constituted an acceptable 'de minimis intrusion on Rodriguez's personal liberty'"

---

[6] We note that the United States Supreme Court issued its decision in *Rodriguez* well after the trial court in this case had ruled on the motion to suppress.

15

and therefore did not violate the Fourth Amendment. The United States Supreme Court reversed, noting that "a dog sniff . . . is not an ordinary incident of a traffic stop . . . [and] is not fairly characterized as part of the officer's traffic mission." Id. at 1615. The Court therefore concluded that the Fourth Amendment does not "tolerate[] a dog sniff conducted after completion of a traffic stop," even if the time by which the stop was extended was minimal. Id. at 1616.

Applying *Rodriguez* to the current case, we find that the four-minute extension of the traffic stop at issue for the purpose of allowing the drug dog to perform a free-air sniff around Gay's car violated Watts's Fourth Amendment rights. Id. See also *Allen*, ___ Ga. at ___ (2) (a) ("prolonging a traffic stop in order to conduct an open-air dog sniff renders the seizure unlawful, even if that process adds very little time to the stop"). The trial court erred in holding otherwise.

(b) The State argues that we should nevertheless affirm the trial court's denial of Watt's motion to suppress, relying on the rule that a police officer may detain the subjects of a traffic stop "after the investigation of the traffic violation is complete . . . if the officer has a reasonable, articulable suspicion that the driver was engaged in

16

other illegal activity." *Bodiford*[7], 328 Ga. App. at 267 (2) (citation and punctuation omitted). The State bears the burden of proving facts that establish a basis for continued detention, *McSwain v. State*, 240 Ga. App. 60, 61 (522 SE2d 553) (1999), and whether the State has met this burden is a question of law. *Rosas v. State*, 276 Ga. App. 513, 516 (1) (b) (624 SE2d 142) ("[w]hether a given set of facts rises to the level of reasonable suspicion is a legal question") (footnote omitted). As explained below, however, in the absence of certain factual and credibility determinations by the trial court, we are unable to address that legal question on this appeal.

In its appellate brief, the State relies on five observations testified to by Franco to support its claim that the police had a reasonable suspicion that the occupants of Gay's car were engaged in illegal activity: the length of time it took Gay to pull over after Franco activated his blue lights; Watts and Gay gave somewhat conflicting statements about their relationship to one another; Gay had "cotton mouth" and both

---

[7] The State did not advance this argument in the trial court, but instead argued only that the four-minute extension of the traffic stop for the purpose of allowing a dog sniff around Gay's car did not violate Watts's Fourth Amendment rights. On appeal, however, the State argues that the trial court should be affirmed under the "right for any reason" rule, because the officers had a reasonable, articulable suspicion of drug activity. See *State v. Thackston*, 289 Ga. 412, 417 (3) (716 SE2d 517) (2011) (an appellee need not anticipate "every conceivable argument in support of the trial court's decision" in order to obtain the benefit of the right-for-any-reason rule).

Gay and Watts had bloodshot eyes; Gay and Watts were smoking cigars; and Watts appeared nervous. We find as a matter of law that one of these facts – the allegedly conflicting statements made by Watts and Gay – provide no basis for suspecting illegal activity, even if viewed in conjunction with the remaining four facts.

As this Court has explained previously, differing statements as to the nature of the relationship between the passengers does not provide police with a basis for suspecting drug activity where those statements offer no "meaningful inconsistencies." *Migliore v. State*, 240 Ga. App. 783, 786 (525 SE2d 166) (1999) (fact that car's driver described female passenger as his girlfriend while the female passenger described the driver as a friend was not a meaningful inconsistency and was therefore insufficient to give rise to a suspicion of illegal activity). See also *Weems* v. State, 318 Ga. App. 749, 751 (734 SE2d 749) (2012) (fact that driver and her male passenger gave conflicting stories as to who had picked up whom earlier in the day did not provide a basis for suspecting criminal activity). Here, Gay described himself as Watts's stepfather while Watts described Gay as his mother's boyfriend. Particularly given that "it is not uncommon for individuals to have different perceptions of the nature of [a romantic] relationship," the alleged inconsistency at

18

issue did not provide police with a basis for suspecting Gay and Watts possessed drugs. *Migliore*, 240 Ga. App. at 786.

The question becomes, therefore, whether the four remaining facts relied upon by the State, when viewed together, provided police with a reasonable, articulable suspicion that Gay's car contained contraband.[8] See *Dominguez*, 310 Ga. App. at 374 ("[t]o show that an officer had reasonable grounds upon which to temporarily detain an individual for the purpose of conducting an investigation, the State is required to prove that the officer then was aware of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention'"), quoting *Lindsey v. State,* 287 Ga. App. 412, 414 (651 SE2d 531) (2007). This question, in turn, depends on whether and to what extent the trial court credits Franco's testimony. We are unable to address this question on appeal because the trial court did not make any findings – either in its written order or on the record at the

---

[8] Based on the current record, we have serious reservations about whether Gay's alleged delay in pulling over can, as a matter of law, support a suspicion of illegal activity. As noted above, the video of the traffic stop shows that Gay pulled over at the first opportunity he had to do so without making a left turn across traffic, a fact that Franco acknowledged on cross-examination. The video further shows that Gay's vehicle, which had been traveling at approximately 35 miles per hour, came to a complete stop on the side of the road approximately 33 seconds after Franco initiated the stop. Nevertheless, because this question may ultimately involve a credibility determination, we leave it for the trial court to address on remand.

motion to suppress hearing – as to whether the State had proven the existence of a reasonable, articulable suspicion of criminal activity sufficient to support the extension of the traffic stop.[9] See *Hughes v. State*, 296 Ga. 744, 747 (1) (770 SE2d 636) (2015) (noting that on a motion to suppress, "'[c]redibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact. The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony.'"), quoting *Tate v. State*, 263 Ga. 53, 56 (3) (440 SE2d 646) (1994). We therefore vacate both the order denying the motion to suppress and the judgment of conviction and remand this case to the trial court. See *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015). We leave it for the trial court on remand to determine what credit and weight to give Franco's testimony and to determine whether that testimony, when viewed in conjunction with the video recordings of the traffic stop, supported an extension of the traffic stop for the purpose of conducting a drug investigation.

2. Watts also seeks to challenge both the trial court's order denying his motion to dismiss the probation warrant and the order denying his request for an appeal bond.

---

[9] The trial court's failure to make such findings is understandable, given the State's failure to advance this argument below as a basis for denying the motion to suppress.

Each of these orders, however, was entered after Watts filed his notice of appeal from his conviction. Accordingly, those orders cannot be enumerated as error on this appeal. See *Pirkle v. Quiktrip Corp.*, 325 Ga. App. 597, 598 (1) (a) (754 SE2d 387) (2014) (a party may not enumerate as error an order entered "after the filing of the notice of appeal"); *Paine v. Nations*, 301 Ga. App. 97, 101 (3) (686 SE2d 876) (2009) (this Court may not consider on appeal orders of the trial court that were entered following the filing of the notice of appeal).

For the reasons set forth above, we vacate both the trial court's order denying Watts's motion to suppress and the judgment of conviction and remand the case for further proceedings consistent with this opinion. See *Williams v. State*, 296 Ga. 817, 820 (771 SE2d 373) (2015) (vacating and remanding decision on motion to suppress for trial court to determine an additional issue, not previously addressed); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) (same). See also *Rodriguez*, 135 S. Ct. at 1617.

*Judgment vacated and case remanded. Andrews, P. J., and Miller, J., concur*.