**SECOND DIVISION**
**DILLARD, P. J.,**
**MILLER, P. J., and MERCIER, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**January 28, 2021**

# In the Court of Appeals of Georgia

A20A1627. TERRY v. THE STATE.

DILLARD, Presiding Judge.

Robert Terry appeals his convictions for violating the Georgia Controlled Substances Act ("GCSA"); possession of marijuana, more than one ounce; driving with a revoked license; and improper display of a license plate. On appeal, Terry argues (1) the evidence was insufficient to support his conviction for violating the GCSA; (2) the trial court erred in denying his motion to suppress evidence because his traffic stop was improperly extended without reasonable, articulable suspicion; and (3) the trial court abused its discretion by excluding a potential defense witness. For the reasons set forth *infra*, we reverse the judgment and remand the case for further proceedings consistent with this opinion.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that on July 29, 2014, Sergeant Peter Lukas with the Georgia State Patrol was working his "normal duty" with two other officers. During his shift, Lukas initiated a traffic stop of a car because he could not see into the vehicle, which suggested the window tint was too dark and in violation of Georgia law. Lukas also noticed that the car's license plate tag was obstructed, which is also illegal in Georgia.

When Lukas approached the car, he observed Terry in the driver's seat and Kabrianna Smith in the front passenger's seat. Lukas asked for Terry's driver's license, but Terry provided him with a Florida identification card instead. Terry then advised Lukas that Smith owned the vehicle, but when Lukas checked the vehicle registration, he learned that the primary owner of the vehicle was Teresa Rodriguez[2] and that Smith was only a secondary owner.

After confirming there was valid insurance for the vehicle, Lukas also discovered that Terry's driver's license was invalid and had been suspended a total of ten times. As a result, Lukas arrested Terry for driving with a suspended license.

_____

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

[2] Once during his testimony, Lukas referred to the registered owner of the car as Teresa Hernandez, but he later clarified that the name on the registration was actually Teresa Rodriguez.

2

Lukas then returned to his patrol car to see if Smith had a valid license so he could release the car to her, and he confirmed that she did. Even so, Lukas asked Smith permission to search the car, but she refused. Despite this refusal, a K-9 officer used his dog to conduct a "free air sniff of the vehicle." And while circling the vehicle, the dog indicated that "there was an odor of some type of marijuana or narcotic." The officers then conducted a full search of the car, during which they found a package containing a "grayish whitish gravel" substance; a "heat sealed bag of [a] green leafy substance;" and $11,420 in cash. Smith also removed a sandwich bag from her pocket containing a "green leafy substance," which—based on Lukas's training and experience—appeared to be marijuana. At this point, Lukas arrested Smith and placed her in the back of another officer's patrol car. Upon further investigation, the crime lab confirmed, *inter alia*, that the leafy substance in the heat-sealed bag was marijuana and the gravel-type substance was "molly."[3]

Subsequently, Terry was charged, via indictment, with violating the GCSA; possession of marijuana, more than one ounce; driving with a revoked license; and

---

[3] *See* https://en.wikipedia.org/wiki/MDMA ("3,4-Methylenedioxymethamphetamine (MDMA),commonly known as ecstasy (E) or molly, is a psychoactive drug primarily used for recreational purposes." (footnote omitted) (Last visited January 27, 2021).

improper display of a license plate. Following a jury trial, Terry was convicted of all charged offenses. Terry then filed a motion for a new trial, which was denied in a cursory order.[4] This appeal follows.

1. Addressing Terry's second argument first, he contends that the trial court erred in denying his motion to suppress evidence obtained after the conclusion of the traffic stop without reasonable, articulable suspicion. We agree.

At the outset, we reject the State's argument that Terry waived this claim of error because, during the trial, he affirmatively represented to the court that he had no objection to the admission of the evidence at issue. In this regard, OCGA § 24-1-103 (a) provides: "Once the court makes a definitive ruling on the record admitting or excluding any evidence, either at *or before* trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal."[5] And here,

---

[4] Terry waived his right to a hearing on his motion for a new trial.

[5] (Emphasis supplied). In the State's brief, it cites one opinion in support of its waiver argument, but that case was decided in 1998, well before the current version of OCGA § 24-1-103 (which was enacted in 2013), so it has no precedential utility here. *See Dyer v. State*, 233 Ga. App. 770 (505 SE2d 71) (1998); OCGA § 24-1-103 (effective January 1, 2013); *see also Heard v. State*, 309 Ga. 76, 85 (3) (b) n.12 (844 SE2d 791) (2020) (citing OCGA § 24-1-103 (a) in rejecting State's argument that the Court's "review should be limited to plain error because Appellant objected to the admissibility of the other-acts evidence only at the Rule 404 (b) conference and not again when the evidence was admitted during the trial."). *Cf. Harris v. State*, ___ Ga.

4

prior to trial, the trial court made a definitive ruling that the drug evidence found in the car was admissible when it denied Terry's motion to suppress that evidence. Then, at the outset of the trial, when Terry attempted to argue a second time that the search of the car was unlawful, the trial court expressly stated that the issue was preserved for appeal and the topic was "off limits." Thus, given the trial court's definitive ruling on Terry's motion to suppress evidence and its representation to him that his "redress [was] on appeal," Terry did not waive his Fourth Amendment challenge by stating that he had no objection to the evidence when it was admitted at trial.

The State also contends that, after his arrest, Terry no longer had "standing" to challenge any delay of the traffic stop leading to the search of Smith's car. But the State never raised this argument in the trial court, and the court did not rule on it.[6] As a result, we will not address it.[7]

_____

___, ___ (2) (c) (850 SE2d 77, 87) (2020) (holding that "because [the defendant] never objected to the . . . evidence below, he has not preserved ordinary appellate review concerning the admission of that evidence").

[6] At the close of the suppression hearing, the State argued that Terry's motion to suppress was untimely, but it did not raise the issue of whether Terry had standing to raise a Fourth Amendment challenge to the search of Smith's car. Thus, Terry was not afforded an opportunity to defend against that assertion.

[7] See Ward v. State, 299 Ga. App. 826, 827 (683 SE2d 894) (2009) ("Inasmuch as we are a court for the correction of errors, we do not consider issues which were

In reviewing the denial of a motion to suppress, we generally must "(1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit [our] consideration of the disputed facts to those expressly found by the trial court."[8] Nevertheless, we review *de novo* the trial court's "application of law to the undisputed facts."[9] With these guiding principles in mind, we turn to Terry's specific arguments on appeal.

---

not raised below and ruled on by the trial court." (punctuation omitted)); *Hutto v. State*, 320 Ga. App. 235, 239-40 (3) (739 SE2d 722) (2013) ("It is well settled that this Court may not address issues on appeal which were not addressed by the trial court, because this Court is a court for the correction of errors and it does not consider matters which were not raised and ruled on by the trial court[,] [and] [w]ithout a ruling by the trial court on this particular issue, there is nothing for this Court to review on appeal." (punctuation and footnote omitted)); *see also United States v. Ross*, 963 F3d 1056, 1062-66 (II) (11th Cir. 2020) (Newsom, J.) (noting distinction between Article III standing and "standing" in the Fourth Amendment context and that the issue of whether a person has "a reasonable expectation of privacy in the object of the challenged search" has "come to be known colloquially (but it turns out misleadingly) as Fourth Amendment 'standing,'" and holding that the government's failure to raise and argue such Fourth Amendment issues acts as a waiver of same).

[8] *State v. Dykes*, 345 Ga. App. 721, 722 (1) (815 SE2d 106) (2018) (punctuation omitted).

[9] *Dykes*, 345 Ga. App. at 722 (1) (punctuation omitted).

6

Lukas testified that, on the night in question, he initiated a traffic stop of Terry's vehicle because it appeared the car's window tint was dark enough to violate Georgia law and his tag registration sticker was obstructed. Lukas initially approached the passenger side of the car, at which point he saw Terry in the driver's seat and Smith in the front passenger seat. Lukas asked Terry for his license and proof of insurance, but Terry only provided him with a Florida identification card, which does not authorize someone to drive. And ultimately, Lukas determined that Terry was driving with a suspended license and arrested him for that offense.

When Lukas ran a check of the car's tag, he discovered the "main registered owner" was Teresa Rodriguez and that she had valid car insurance. Smith's name was also listed at the "very bottom of the registration[.]" Lukas then went to speak to Smith, who provided registration paperwork for the car with her name on it. Lukas asked Smith—who was still sitting in the car—if she had a valid driver's license because, if so, he planned to release the vehicle to her. And when Smith provided him with her Florida driver's license, he confirmed that it was indeed valid. At this point, Lukas gave Smith her license and registration paperwork back and indicated that she was free to leave. Although Lukas testified that he did not expressly tell Smith she was free to leave, he returned all of her belongings and believed he had "no legal

7

grounds to keep her."[10] Nevertheless, *after* checking Smith's license and registration and concluding that she was free to leave, Lukas asked Smith if he could search her car, but she refused.

So, even though Smith had a valid license, was free to leave, and refused to consent for a search of the car, Lukas informed her that a K-9 officer—who was already on the scene—was going to walk around the vehicle with his dog for a "free air sniff." And when the dog circled Smith's car, it indicated on the front side passenger door. As a result, the officers searched Smith's car and found drugs "stuffed down between the passenger seat and center console" in a bag wrapped in a t-shirt. Specifically, the officers discovered a heat-sealed bag of marijuana, a clear bag of pills, and a bag containing "an off white rock like substance." The officers also located money in the center console of the car. Based on these discoveries, the officers then searched Smith, and she pulled a "little bag of marijuana" out of her pants. Smith was then arrested and placed in a patrol car.

---

[10] At first, Lukas testified that he told Smith she could leave when he returned her belongings, but then he clarified by testifying, "I gave her all her stuff back. I don't think I actually said you are free to go. I [gave] her all her stuff back; and at that point, she [was] free to go."

Although Terry concedes that the initial traffic stop was lawful, he argues that the open air dog sniff of Smith's car was unlawful because it was conducted after the "mission" of the traffic stop was complete. Specifically, he contends that after the traffic stop was complete, Lukas lacked any reasonable, articulable suspicion to prolong the stop to conduct the open-air K-9 search.[11] We agree.

As the Supreme Court of the United States has explained,

> a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if

---

[11] In discussing the time line and order of events of the traffic stop, Terry often cites to or references a video recording of the stop; but he did not include the video in the appellate record. As a result, in considering whether the trial court erred in denying Terry's motion to suppress evidence, we are limited to the testimony presented at the suppression hearing. *See Crawford v. State*, 288 Ga. 425, 427 (2) (704 SE2d 772) (2011) ("An appellant has the burden of proving trial court error by the appellate record, and must compile a complete record of what transpired in the trial court. Otherwise, there is not sufficient information for an appellate court's review and the trial court ruling enumerated as error must be upheld. When a portion of the evidence bearing upon the issues raised by the enumerations of error is not brought up in the appellate record so that this court can make its determination from a consideration of it all, an affirmance as to that issue must result." (punctuation omitted)).

it is prolonged beyond the time reasonably required to complete that mission.[12]

Thus, the "tolerable duration of police inquiries in the traffic-stop context" is determined by "the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."[13] But after the tasks related to the investigation of the traffic violation and processing of the citation have been accomplished, an officer "cannot continue to detain an individual without reasonable articulable suspicion"[14] And significantly, reasonable, articulable suspicion requires a "particularized and objective basis for suspecting that a citizen is involved in criminal activity."[15]

---

[12] *State v. Allen*, 298 Ga. 1, 4 (2) (a) (779 SE2d 248) (2015) (quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (125 SCt 834, 160 LE2d 842) (2005)); *accord State v. Herman*, 344 Ga. App. 359, 361 (810 SE2d 183) (2018).

[13] *Allen*, 298 Ga. at 4-5 (2) (a) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (II) (135 SCt 1609, 191 LE2d 492) (2015)); *accord Hall v. State*, 351 Ga. App. 695, 699 (1) (832 SE2d 669) (2019).

[14] *Hall*, 351 Ga. App. at 699-700 (1) (punctuation omitted); *accord Sherod v. State*, 334 Ga. App. 314, 321 (1) (779 SE2d 94) (2015); *Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002).

[15] *Hall*, 351 Ga. App. at 700 (1) (punctuation omitted); *accord Sherod*, 334 Ga. App. at 321 (1); *State v. Whitt*, 277 Ga. App. 49, 50 (625 SE2d 418) (2005).

Importantly, a dog sniff of a traffic-stopped vehicle is "not fairly characterized as part of the officer's traffic mission, because it is a measure aimed at detecting evidence of ordinary criminal wrongdoing."[16] As a result, prolonging a traffic stop in order to conduct an open-air dog sniff "renders the seizure unlawful, *even if that process adds very little time to stop*."[17] Indeed, the Supreme Court of the United States has clearly held that "conducting an open-air dog sniff around a vehicle *during a traffic stop does not itself violate the Fourth Amendment, and—like other

---

[16] *Allen*, 298 Ga. at 5 (2) (a) (punctuation omitted); *accord Watts v. State*, 334 Ga. App. 770, 778 (1) (a) (780 SE2d 431) (2015); *see Rodriguez* 575 U.S. at 355 (II) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. A dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing." (punctuation and citations omitted)).

[17] *Allen*, 298 Ga. at 5 (2) (a) (punctuation omitted) (emphasis supplied); *see Rodriguez* 575 U.S. at 357 (II) (rejecting the government's argument that a dog sniff may "incrementally" prolong a stop as long as the overall duration of the stop remains reasonable); *Herman*, 344 Ga. App. at 361 ("[T]he relevant question is whether the open-air dog sniff prolonged the stop for *any amount of time*. If it did not, the open-air dog sniff was lawful." (citations omitted) (emphasis supplied)); *see also Watts*, 334 Ga. App. at 778 (1) (a) ("Applying *Rodriguez* to the current case, we find that the four-minute extension of the traffic stop at issue for the purpose of allowing the drug dog to perform a free-air sniff around [the] car violated [the defendant's] Fourth Amendment rights.").

11

investigation unrelated to the stop—it can be lawfully done so long as it does not lengthen the stop *at all*."[18] Lastly, a trial court's conclusion that "a traffic stop was unreasonably prolonged may often be a fact-intensive determination, but it is ultimately a holding of constitutional law that we review de novo."[19]

The question in this case, then, is whether "the free-air dog sniff that resulted in probable cause to . . . search inside [the] car was done while some other task *related to the mission of the traffic stop* was still being conducted, so that the sniff did

---

[18] *Allen*, 298 Ga. at 5 (2) (a) (citing *Rodriguez* 575 U.S. at 354-55 (II) (emphasis supplied)); *see Rodriguez* 575 U.S. at 354-55 (II) (explaining that the Supreme Court of the United States has "concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention," including questioning unrelated to the mission of the stop and an open-air dog sniff); *Illinois v. Caballes*, 543 U.S. 405, 409 (125 SCt 834, 160 LE2d 842) (2005) ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose contraband items that would otherwise remain hidden from public view'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (citation omitted)); *State v. Simmons*, 283 Ga. App. 141, 143 (640 SE2d 709) (2006) ("The use of a drug sniffing dog to conduct a free air search around the exterior of the vehicle during the course of a lawful traffic stop does not implicate the Fourth Amendment . . . ." (citation omitted)).

[19] *Allen*, 298 Ga. at 4 (2); *see Flores v. State*, 347 Ga. App. 174, 177 (2) (818 SE2d 90) (2018) ("Whether a traffic stop was unreasonably prolonged may often be a fact-intensive determination, but it is ultimately a holding of constitutional law that we review de novo." (punctuation omitted)).

12

not add any time to the stop."[20] And here, the undisputed evidence shows that all tasks related to the mission of the traffic stop were completed *before* the free-air dog sniff was conducted. Indeed, Lukas testified that when he gave Smith "her stuff back," which was prior to the dog sniff, she was "free to go[,]" and the only reason he asked her to stay by his patrol car was because he did not want her to get hit by a car while walking down the interstate. Thus, while Lukas stated that he knew from his experience and training there was "something" in Smith's car, he also testified that if Smith wanted to, she could have "[gotten] in her vehicle and [driven] away." Lukas then reiterated that, by this point, he had given "all her information back," and "technically, she was free to leave."[21]

---

[20] *Allen*, 298 Ga. at 5 (2) (a) (emphasis supplied); *see Herman*, 344 Ga. App. at 362 (explaining that, in determining whether a traffic stop was unreasonably prolonged by an open air sniff search, the relevant question is whether the open-air dog sniff "was done while some other task related to the mission of the traffic stop was *still being conducted*, so that the sniff did not add any time to the stop" (punctuation omitted) (emphasis supplied)).

[21] Our Supreme Court has held that computer records check on an occupant of a vehicle "is an ordinary officer safety measure incident to the mission of the traffic stop, and it therefore could permissibly extend the stop for a reasonable amount of time." *Allen*, 298 Ga. at 13 (2) (d). But again, by the time the dog sniff occurred, Lukas had already completed record checks on both Terry and Smith and concluded that Smith was free to leave. *See id.* ("The sequence of the officer's actions during a traffic stop is not determinative; instead, the primary question is whether the activity at issue was related to the mission of the stop. If it is not, like a dog sniff, it can be

13

So, although Lukas believed there were "indications of criminal activity going on," he nevertheless determined that he had "no legal grounds" to keep Smith after determining that she had a valid license and returning her belongings. Additionally, prior to the K-9 search, Terry had already been arrested, and there were no remaining tasks related to his offense of driving with a suspended licenses being conducted. Given the foregoing, the undisputed evidence shows that all tasks related to the mission of the traffic stop were completed *before* Lukas asked for Smith's consent to search the car and *before* the free air stiff was conducted.[22] Thus, the officers prolonged the traffic stop after the mission of the stop was completed in order to

---

done only *concurrently* with a mission-related activity, or it will unlawfully add time to the stop." (emphasis supplied)).

[22] *See Salmeron v. State*, 280 Ga. 735, 737 (1) (632 SE2d 645) (2006) ("An officer conducting a routine traffic stop may request and examine a driver's license and vehicle registration and run a computer check on the documents." (punctuation omitted); *Heard v. State*, 325 Ga. App. 135, 139 (1) (751 SE2d 918) (2013) ("The officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning.").

conduct an open-air dog sniff, which renders the seizure at issue unlawful.[23] And this is true even if that process added "very little time to stop."[24]

To be sure, an officer may *detain* a suspect after the conclusion of a traffic stop and continue to interrogate him or seek consent for a search so long as the officer has reasonable suspicion of criminal activity.[25] But that is not what happened here. Again, according to Lukas, Smith was not detained at the time of the dog sniff. To the contrary, Lukas testified that Smith was free to leave in the car that was ultimately searched as soon as he returned her license and other documents. Lukas also testified

---

[23] *See supra* notes 17-18 & accompanying text.

[24] *Allen*, 298 Ga. at 5 (2) (a) (punctuation omitted); *see Rodriguez* 575 U.S. at 357 (II) (rejecting the government's argument that a dog sniff may "incrementally" prolong a stop as long as the overall duration of the stop remains reasonable; *Watts*, 334 Ga. App. at 777 (1) (a) (citing *Rodriguez* and explaining that "[t]he United States Supreme Court, [has] . . . rejected the concept that the Fourth Amendment allows any kind of extension of a traffic stop beyond the investigation of the traffic violation that warranted the stop, even if that extension could be considered minimal").

[25] *See Salmeron*, 280 Ga. at 737-38 (1) ("[A] law enforcement officer's continued questioning of a vehicle's driver and passengers outside the scope of a valid traffic stop passes muster under the Fourth Amendment either when the officer has a reasonable articulable suspicion of other illegal activity or when the traffic stop has de-escalated into a consensual encounter." (punctuation omitted)); *Bodiford v. State*, 328 Ga. App. 258, 267 (2) (761 SE2d 818) (2014) ("An officer may continue to detain a driver after the investigation of the traffic violation is complete only if the officer has a reasonable, articulable suspicion that [the driver] was engaged in other illegal activity." (punctuation omitted)).

at length during the suppression hearing about the circumstances that caused him to believe that evidence of criminal activity would be found in Smith's car, such as discrepancies between Smith and Terry's stories regarding where they were going and for how long, Smith acting nervous, and the apparent absence of luggage. But regardless of those concerns, at the time of the dog sniff, Smith was not detained due to the officers' reasonable suspicion of criminal activity. Instead, the traffic stop was completed, her belongings had been returned, and she was free to leave. Again, even Lukas testified that, after returning Smith's belongings, he had *no legal basis to detain her*, which means he certainly did not have a *particularized* and objective basis for suspecting that Terry or Smith were involved in criminal activity unrelated to the traffic stop.[26]

Under foregoing circumstances, the trial court abused its discretion in denying Terry's motion to suppress the evidence seized from Smith's car.[27]

---

[26] *See supra* note 15 & accompanying text.

[27] *See Reyes v. State*, 334 Ga. App. 552, 556 (2) (780 SE2d 674) (2015) (holding that the trial court erred in denying a motion to suppress evidence when it was clear that the dog sniff was performed after the traffic-violation stop concluded and after several more minutes of the officer attempting to get the defendant's consent to search the vehicle); *Watts*, 334 Ga. App. at 777 (1) (a) (holding that a traffic stop was completed, at the latest, when the officers were satisfied that they knew the defendant's identity and legal status and the dog sniff was unlawful because it

2. Given our holding in Division 1, Terry is entitled to a new trial and we need not address his remaining claims of error.

For all these reasons, we reverse the trial court's denial of Terry's motion to suppress and remand the case for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Miller, P. J., and Mercier, J., concur.*

---

occurred four minutes later); *Heard*, 325 Ga. App. at 138 (1) (holding that a search was unlawful when it was occurred *after* the *traffic* investigation ended and, absent consent, the defendant was "free to leave"); *see also Caballes,* 543 U.S. at 407 ("A seizure that is justified *solely by the interest in issuing a warning ticket* to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." (emphasis supplied)). *Cf. Allen*, 298 Ga. at 5 (2) (a) (holding that a dog sniff did not violate the Fourth Amendment when it "was conducted *while [the law enforcement officer] was waiting for the return of the computer records check* on [the defendant's] identification, which was an ordinary officer safety measure related to the mission of the traffic stop [such that] the dog sniff did not prolong the stop at all" (emphasis supplied)); *Herman*, 344 Ga. App. at 362 (holding that the officers did not unreasonably prolong the traffic stop when the K-9 open air sniff search was performed *while* the officers were still checking the driver's license).

17