**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 10, 2020**

# In the Court of Appeals of Georgia

A19A2413. THE STATE v. JENKINS.                    DO-082 C

DOYLE, Presiding Judge.

Craig Lynn Jenkins ("the defendant") was charged with two counts of aggravated assault[1] and one count of possession of a firearm during the commission of a felony.[2] Following his indictment, the defendant filed a motion for immunity from prosecution under OCGA § 16-3-24.2 on the basis that he reasonably believed his actions of shooting two men were necessary to prevent imminent death or great bodily injury to another person. The trial court granted the motion, and the State appeals. For the reasons that follow, we affirm in part and reverse in part.

---

[1] OCGA § 16-5-21 (a) (2).

[2] OCGA § 16-11-106 (b) (1).

On appeal of an order granting pretrial immunity, "we review the evidence in the light most favorable to the trial court's ruling, and we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them."[3]

So viewed, the record shows that on July 22, 2017, at approximately 7:00 p.m., the defendant and two friends — Cacee Gwyn and "Mack" — went to a restaurant in Gwinnett County. The defendant consumed multiple alcoholic beverages while there,[4] and he socialized with Phillip Williams and another patron, Levi Hencely.[5] At one point, Williams and Hencely left the restaurant to race each other in their cars; the defendant remained at the bar. Soon thereafter, the men, including Williams's brother — Daniel Jackson, who arrived before the race — returned to the bar and continued to drink.

---

[3] (Citation and punctuation omitted.) *State v. Bunn*, 288 Ga. 20, 23 (701 SE2d 138) (2010).

[4] The defendant testified that he "may" have eaten an appetizer while there, and he conceded that he "had enough beers in [him] to be . . . classified as intoxicated. . . ."

[5] The defendant had never met Williams, Jackson, or Hencely before that evening.

Shortly before midnight, everyone in the group proceeded into the parking lot, where Hencely and Williams began to argue about the race, "scuffling around like they're fighting." Both Jackson and the defendant retrieved hand guns and fired; the defendant shot Jackson and Williams in the leg, and a bullet from Jackson's gun grazed the defendant's shoulder. The defendant and Mack fled in the defendant's truck, and Jackson and Williams went to a nearby hospital, where they received medical treatment and met with a detective.

The defendant did not call the police the night of the incident. Instead, police identified him and Gwyn three days later through Gwyn's Facebook page after speaking with people at the restaurant. The detective interviewed the defendant, and the interview was recorded and transcribed. Initially, when asked what happened at the restaurant, the defendant stated that he and Gwyn "h[u]ng out with a bunch of guys[,] and at the end, somebody started shooting[,] and we all jumped in and ran like hell." The defendant repeatedly told the detective that he did not see who was shooting, and he stated that although he possessed a gun, he did not have it with him that night. The detective then told the defendant that he had seen video of the incident, at which point the defendant changed his story, explaining that: "As soon as I walked out [of the restaurant, I looked up[,] and . . . it looked like [one of the

3

men] had grabbed their gun, pulled it out[,] and was behind [Gwyn]."[6] Because he thought the gunman "was going to shoot [Gwyn,] . . . [the defendant] turned around[,] . . . pulled [his] gun out[,] and . . . pointed it down towards the ground towards the left of [the gunman] and shot a couple times. . . . Maybe I thought I would scare him[,] and he would go the other way or not shoot [Gwyn] or something." When asked at what he was aiming, the defendant replied, "The ground and then in the vicinity that dude was that had the gun that was shooting back at me. . . . Well, I mean, at first, I was in defense mode for [Gwyn,] and I didn't really want to shoot him because I mean I was scared, but I didn't want to . . . shoot somebody." The defendant testified, "I mean, I didn't shoot towards anybody else or at anybody else. It was just the guy with the gun." When asked whether he — the defendant — shot first, the defendant responded, "Yeah, I think so." According to the defendant, the other man returned fire, and the defendant, Gwyn, and Mack fled the scene. According to the defendant, he did not report the incident to police because he "was too scared."

The defendant was charged with possession of a firearm during the commission of a felony and two counts of aggravated assault, one based on shooting Jackson and

---

[6] The defendant stated that the gunman was "[o]ne of the guys. I think it was a black guy. I don't know which guy it was."

the other based on shooting Williams. Thereafter, the defendant filed a motion for pretrial immunity pursuant to OCGA § 16-3-24.2, arguing that he was justified in "using force against another" pursuant to OCGA § 16-3-21 "to the extent that he . . . reasonably believe[d] that such force [was] necessary to defend . . . a third person against such other's imminent use of unlawful force. . . ."

At the hearing, Jackson testified that after he left the restaurant, one of the other men began arguing with Jackson and Williams about the race. When the man threatened to stab them, Jackson went to his truck, retrieved a gun from the center console, chambered a round, set the gun on the seat, closed the door, and walked towards the back of his truck. According to Jackson, he then saw the defendant aim a gun towards Williams. Jackson and one of the defendant's friends told him to put the gun down, and when the defendant replied, "you got a gun," Jackson lifted up his shirt and showed him that he did not have a gun. The defendant then fired "eight [or] nine" shots towards Williams. Jackson testified that when he saw "the dust hit around [Williams]" and Williams grab his leg, Jackson ran to his truck, retrieved his gun, and fired three or four shots toward the defendant, who was returning fire, resulting in a bullet wound to Jackson's knee. Jackson and Williams then left and went to a nearby hospital.

5

The detective testified at the hearing, during which testimony the State played video from the defendant's interview with police, the surveillance video from the restaurant, and cell phone video taken by a witness from inside the restaurant.[7] The detective explained that after reviewing video and speaking with witnesses, he concluded that at the time the defendant shot Williams, Williams and Hencely were approximately 20 to 30 yards from Jackson's vehicle, where Jackson was standing.

---

[7] At the hearing, defense counsel advised the trial court that he and the State "have stipulated to the introduction of the recordings for this hearing," and the State noted that there was cell phone video and video from the restaurant's surveillance camera. The State then marked the surveillance video as an exhibit, the trial court admitted it without objection, and it was played for the court. The State then played the cell phone video, but it was neither tendered for admission, nor admitted. Later, during the detective's testimony, the State identified the cell phone video as an exhibit and replayed at least a portion of it, but it was not admitted at that time. The State refers to the cell phone video in its appellate brief; the defendant, however, concedes on appeal that while the cell phone video was played, it was neither tendered nor admitted and is not part of the record. This Court contacted the trial court to inquire about the cell phone video, and the trial court responded that it was not admitted into evidence and is not a part of the record. In its order granting immunity, the trial court stated that it heard "evidence and argument," but it makes no specific mention of the cell phone video. Because the cell phone video was neither tendered nor admitted, and it is not in the record, we do not consider it. See *Sherod v. State*, 334 Ga. App. 314, 315, n.9 (779 SE2d 94) (2015) (declining to consider a video recording of a traffic stop that was played at trial but not admitted nor transmitted with the record on appeal). We note, however, that based on our review of the transcript and the parties' representations about the content of the video in their briefs, it does not appear that consideration of the cell phone video would change the outcome of this case.

The detective also explained that the defendant did not recall shooting in Williams's direction.

The surveillance video from the restaurant shows the defendant leaning against his truck. At one point, several other men appear in the screen, and it appears that two of them are arguing; the argument then moves off-camera. The defendant then retrieves a gun from his truck, points his gun over the hood of his truck in one direction, then makes an adjustment to his left and fires approximately seven shots, walks out from behind his truck and fires several more shots in the same direction followed by another shot five or six seconds later, and then more shots before someone returns fire.[8] The defendant and his truck are shown on the video, but the men being shot and the other gunman are not because they are outside the frame of the surveillance camera.

The defendant testified at the hearing as well, explaining that he retrieved his own gun from his truck after he saw Jackson with a gun. When asked why he did so, the defendant responded that Jackson was "pointing [a gun] at everybody in the parking lot." According to the defendant, "everybody that was in the situation was

_____

[8] One of the bullets grazed the defendant's arm, but that is not apparent from the video.

probably eight foot [sic] away from each other[,] and it started with . . . Jackson closest to the rear of his vehicle, then . . . Williams, then [Gwyn], then . . . Hencely." The defendant stated that he shot before Jackson did, "five or six [shots] initially," before Jackson shot towards him, striking the defendant in the shoulder. The defendant testified that he "didn't know that Phillip Williams was shot until [the d]etective told me." The following colloquy then ensued:

> Q: Okay. Detective Dyals asked you [if you] can explain why you turned your body and shot at . . . Williams and . . . Hencely first. Do you recall that?

> A: I didn't shoot — I mean, he may have asked me. I don't — I didn't shoot at Mr. Williams and Hencely first. *I never shot at the guys without the guns*.

> Q: Well, you hit . . . Williams[,] so you must have shot at him; correct?

> A: Okay. I shot at Mr. Jackson. Mr. Williams was running back to Mr. Jackson's vehicle, so he got in between me and his line of fire. I mean, who's to say that it wasn't Mr. Jackson that shot Mr. Williams because when I shot, he was pointing his gun this way. . . .

> Q: Well, you never told Detective Dyals that Mr. Williams ran back, did you?

8

A:    I never seen that he did run back over.[9]

The State then reminded the defendant that there was cell phone video of Williams being shot, and a colloquy between the lawyers and the trial court ensued. The State then asked the defendant:

Q:    Is it your testimony that Mr. Williams was over near Mr. Jackson when he is hit? Is that your recollection?

A:    I'm not sure . . . where Mr. Williams was. . . . I was pointing at Mr. Jackson. I know that they were all squaring off together, fighting together, so.

After the hearing, the trial court entered an order granting the defendant's motion for immunity. In the order, the court summarizes the facts, including stating that as the argument between Williams and "the other driver" escalated to "a fist fight," Jackson retrieved a firearm from inside his vehicle,

and although he testified that he only laid the firearm on the back seat of his truck, both the [d]efendant and [the defendant's co-worker] testified seeing the firearm and that . . . Williams [sic][10] became

---

[9] (Emphasis supplied).

[10] The trial court apparently mistakenly stated that "Williams became aggressive with the firearm." The remainder of the order states that Jackson, not Williams, had a gun.

9

aggressive with the firearm, waiving it around and pointing it at the two men involved in the fight. The [d]efendant's co-worker and friend, also involved in the events of the evening, became entangled in the situation because his car was parked in close proximity to the spot where the two men were fighting, as well as finding himself between the fight and . . . Jackson waiving his firearm. At that point, with . . . Jackson waving his firearm and pointing it toward the fist fight and the [d]efendant's co-worker, the [d]efendant became alarmed and retrieved his firearm from his car, pointed it toward . . . Jackson[,] who was still brandishing his firearm and heading toward the [d]efendant's co-worker. Shots were fired by both firearms.

After quoting OCGA § 16-3-21 (a), the trial court granted the motion for immunity, finding that "the [d]efendant was justified in his belief that it was necessary to defend third parties against Mr. Jackson's imminent use of unlawful force. The defendant has met his burden, showing by a preponderance of the evidence, that he is entitled to immunity from prosecution pursuant to OCGA § 16-3-21."[11]

---

[11] The trial court apparently mistakenly referred to OCGA § 16-3-23, which addresses the use of force in defense of habitation, but quoted OCGA § 16-3-21, which addresses the use of force in defense of self or others.

10

The State appeals,[12] arguing that the record does not support the trial court's conclusion that the defendant was justified in shooting the victims. "To avoid trial based on a justification defense presented at an immunity hearing, a defendant bears the burden of showing that he is entitled to immunity under OCGA § 16-3-24.2 by a preponderance of the evidence."[13] "Nothing in this standard requires the elimination of all fact disputes as a matter of law. Rather, the standard requires only that the finder of fact be inclined by the evidence toward one side or the other."[14]

"A person who uses threats or force in accordance with OCGA § 16-3-21 'shall be immune from criminal prosecution therefor,' except in certain circumstances not at issue here."[15] OCGA § 16-3-21 (a) provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against

---

[12] See *State v. Yapo*, 296 Ga. App. 158, 159 (1) (674 SE2d 44) (2009) (the State may appeal an order granting pretrial immunity under OCGA § 5-7-1 (a) (1)).

[13] (Punctuation omitted.) *Cotton v. State*, 297 Ga. 257, 258 (2) (773 SE2d 242) (2015), quoting *Bunn v. State*, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008).

[14] (Punctuation omitted.) *Bunn*, 288 Ga. at 22, quoting *Murray v. State*, 269 Ga. 871, 873 (2) (505 SE2d 746) (1998).

[15] *State v. Jennings*, 337 Ga. App. 164, 166 (786 SE2d 545) (2016), quoting OCGA § 16-3-24.2.

such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

"[T]he subjective intent of a defendant is irrelevant to the assessment of a claim of justification."[16] Instead, a justification defense is assessed on whether circumstances "would have excited the fears of an objective reasonable person to the point where the use of [force intended or likely to cause death or great bodily harm] was justified."[17]

In this case, the defendant alleged that he was justified in shooting Jackson and Williams because he reasonably believed that such force was necessary to defend a third person against the imminent use of unlawful force. We are required to accept the trial court's factual findings and credibility determinations if there is any evidence to support them.[18]

---

[16] *Bunn*, 288 Ga. at 22, n. 5.

[17] *Lewis v. State*, 270 Ga. 891, 893 (2) (515 SE2d 382) (1999).

[18] See *Bunn*, 288 Ga. at 23; *Blazer v. State*, 266 Ga. App. 743 (598 SE2d 338) (2004) (affirming trial court's denial of motion for immunity when the facts are

1. *Aggravated assault against Jackson.* The trial court resolved the issues of fact and made a credibility determination in favor of the defendant, finding that Jackson was the first person to wield a gun and that he "became aggressive with the firearm, waiving it around and pointing it at the two men involved in the fight," notwithstanding conflicting evidence to the contrary. Because there is evidence in the record to support this credibility determination and these factual findings, as well as the court's conclusion that "the [d]efendant was justified in his belief that it was necessary to defend third parties against . . . Jackson's imminent use of unlawful force" we must accept them.[19] Thus, "[c]onstrued in a light most favorable to the trial court's ruling, with respect to [the charge of aggravated assault against Jackson], the evidence was sufficient for the trial court to determine that [the defendant] met his burden of proving that he was entitled to immunity from prosecution pursuant to OCGA § 16-3-24.2."[20]

---

disputed because based on "the trial court['s ruling] against [the defendant], we . . . must infer that the trial court found [another witness's] testimony more credible than [the defendant's] . . . [and] affirm [because] some evidence supports the trial court's ruling").

[19] See *Bunn*, 288 Ga. at 23; *Blazer*, 266 Ga. App. at 745 (2).

[20] (Punctuation omitted.) *State v. Jennings*, 337 Ga. App. 164, 167 (786 SE2d 545) (2016), quoting *State v. Green*, 289 Ga. 802, 804 (1) (716 SE2d 194) (2011).

13

2. *Aggravated assault against Williams*. There is no evidence, however, to support the trial court's grant of immunity as to the charge of aggravated assault against Williams.

The undisputed evidence shows that the defendant initially shot at and hit Williams, who was unarmed and standing 20 to 30 feet away from Jackson, who the defendant maintained was wielding the gun. Furthermore, the defendant was not even aware that he shot Williams until the detective so advised him. Notably, the trial court did not make a finding that the defendant was justified in shooting Williams, instead concluding only that "the [d]efendant was justified in his belief that it was necessary to defend third parties against *Mr. Jackson's* imminent use of unlawful force."[21] And the factual findings and credibility determinations that the trial court did make and we are required to accept because they are supported by the record — that *Jackson* retrieved his gun before the defendant did and then pointed it towards others — do not support a conclusion that the defendant "reasonably believed at the time he fired

---

See also *State v. Cooper*, 324 Ga. App. 32, 34-35 (1) (749 SE2d 35) (2013) (evidence could be construed in a manner to support trial court's conclusion that the defendants' actions were justified such that they were entitled to immunity from prosecution).

[21] (Emphasis supplied.)

14

his . . . gun [at *Williams*] that his action was necessary to prevent death or great bodily injury to [a third person]."[22]

The defendant argues that based on the evidence, the trial court may have concluded that he did not fire the shot that struck Williams or that if he did, it was accidental. Even assuming that the trial court made such a finding, its grant of immunity was based on justification, not on a finding that the shooting of Williams was accidental or that the defendant was not the person that shot him. Therefore, although the defendant may assert these defenses at trial,[23] they are not proper bases for a grant of immunity based on justification.

Accordingly, the trial court erred by granting immunity to the defendant as to the defendant's charge of aggravated assault against Williams.[24]

---

[22] *Bunn*, 288 Ga. at 22, n. 5.

[23] See, e.g., *Turner v. State*, 262 Ga. 359, 360 (2) (b) (418 SE2d 52) (1992) ("Generally, either accident or self defense will be involved in a case, but not both. However, the facts of a case will, at times, present a situation where a party who is armed with a weapon contends that while he was defending himself from another party, his weapon accidentally discharged and killed that other party.") (footnote omitted).

[24] See *State v. Morgan*, 346 Ga. App. 702, 705 (1) (2018) (physical precedent only) (reversing trial court's grant of immunity "[b]ecause there is no evidence to support the conclusion that [the defendant] was entitled to use force against his wife in order to protect the couple's dog). See also *State v. Jennings*, 337 Ga. App. 164,

3. *Possession of a firearm during the commission of a felony.* Because we have reversed the trial court's grant of pretrial immunity as to the aggravated assault charge against Jackson, we also reverse the grant of pretrial immunity as to the charge of possession of a firearm during the commission of a felony.

*Judgment affirmed in part and reversed in part. Coomer and Markle, JJ., concur.*

---

165-167 (786 SE2d 545) (2016) (affirming trial court's grant of immunity as to one victim but not as to the other).